949 So.2d 117 (2006)
Kimberly Denise PROWELL, individually and as administratrix of the estate of Keiterica Deshae Holley, deceased
v.
The CHILDREN'S HOSPITAL OF ALABAMA.
Kimberly Denise Prowell, individually and as administratrix of the estate of Keiterica Deshae Holley, deceased
v.
Kathryn Brock, M.D., and Pediatric Anesthesia Associates, P.C.
1041131 and 1041493.
Supreme Court of Alabama.
May 12, 2006.
Rehearing Applications Denied July 21, 2006.
*119 G. Daniel Evans of Evans & Sexton, P.C., Birmingham; and Peter F. Burns of Burns, Cunningham, Mackey & Fillingim, Mobile, for appellant.
Jasper P. Juliano and J. Alex Wyatt III of Parsons, Lee & Juliano, P.C., Birmingham, for appellee The Children's Hospital of Alabama.
Michael A. Florie, Joseph S. Miller, and J. Wilson Axon, Jr., of Starnes & Atchison, LLP, Birmingham, for appellees Kathryn Brock, M.D., and Pediatric Anesthesia Associates, P.C.
*120 STUART, Justice.
Kimberly Denise Prowell, individually and in her capacity as the administratrix of the estate of Keiterica Deshae Holley, deceased, appeals from a summary judgment in favor of the Children's Hospital of Alabama (case no. 1041131). Prowell also appeals from the trial court's denial of her motion for a new trial following a judgment entered on a jury verdict for Dr. Kathryn Brock and Pediatric Anesthesia Associates, P.C. (case no. 1041493).
In both case no. 1041131 and case no. 1041493, we reverse and remand.

Introduction
This medical-malpractice action results from complications from anesthesia administered during surgery. On October 21, 1998, Keiterica Deshae Holley, who was five years old, was admitted to the Children's Hospital of Alabama for a tonsillectomy. Holley was no stranger to surgery, having had five previous surgical procedures. She suffered from several medical conditions that, combined with her enlarged tonsils, made Holley a difficult patient for anesthesia.
On the day of her scheduled tonsillectomy, while the anesthesia team was preparing Holley for the surgery, i.e., inducing sleep ("induction") and intubating her, Holley suffered catastrophic complications, which caused her to be deprived of oxygen and adequate ventilation for at least five minutes and as long as seven minutes. Holley left the operating room in a vegetative state. She died on November 29, 2001, a little over three years later.
Prowell, Holley's mother, filed this action before Holley's death in her individual capacity and on behalf of Holley.[1] In the complaint, Prowell named as defendants (1) Dr. Kathryn Brock, the attending pediatric anesthesiologist in charge of the operating room the day of Holley's surgery; (2) Pediatric Anesthesia Associates, P.C., Dr. Brock's employer; (3) Dr. Larry Mackall, a shareholder in Pediatric Anesthesia Associates, P.C., and the anesthesiologist in charge of Holley's anesthesia prescreening; (4) Dr. Vijah Singh, an anesthesiologist who attempted to intubate Holley in the operating room; (5) Dr. Brian Wiatrak, Holley's ear, nose, and throat surgeon who also attempted to intubate Holley in the operating room; (6) the University of Alabama Health Services Foundation, Dr. Wiatrak's employer; and (7) Children's Hospital, based upon the acts of its employee Ann Gaston, a certified registered nurse anesthetist ("CRNA"), who also attempted to intubate Holley in the operating room.
Dr. Singh and Dr. Mackall filed separate motions for a summary judgment. Prowell did not oppose those motions, and the trial court entered summary judgments in favor of Dr. Singh and Dr. Mackall. Prowell later entered into a pro tanto settlement with Dr. Wiatrak and University of Alabama Health Services Foundation. This left as defendants Children's Hospital, Dr. Brock, and Pediatric Anesthesia Associates, P.C.
Children's Hospital filed a motion for a summary judgment asserting that Prowell had failed to establish a prima facie case against it and submitted documents in support of that motion. Prowell opposed that motion. After a hearing held on February 17, 2005, the trial court granted Children's Hospital's motion. On February 25, 2005, Prowell filed a motion to reconsider, which the trial court overruled.
*121 Prowell's remaining claims against Dr. Brock and Pediatric Anesthesia Associates were tried before a jury, beginning February 28, 2005. The jury heard from Prowell; Dr. Brock; Dr. Singh (by deposition); Dr. Miles Dinner (Prowell's expert witness); Dr. Wiatrak (by deposition); and Dr. David Steward (Dr. Brock's expert witness). In addition, Prowell offered the deposition testimony of Dr. Raeford Brown at trial to rebut Dr. Brock's testimony and to bolster Dr. Dinner's testimony. Dr. Brock had previously identified Dr. Brown as a potential expert witness; however, after his deposition, Dr. Brock withdrew him as an expert witness. The trial court prohibited Prowell from introducing Dr. Brown's testimony at trial. The trial continued, with detailed medical testimony presented to the jury.
On March 8, 2005, the jury returned a verdict in favor of Dr. Brock and Pediatric Anesthesia Associates. On March 9, 2005, the trial court entered a final judgment on the jury's verdict. Prowell filed a motion for a new trial, asserting, among other grounds, that the trial court's ruling disallowing Dr. Brown's testimony was reversible error and that the trial court's instructions to the jury were so misleading and confusing as to prejudice Prowell's case. After a hearing, the trial court overruled that motion. Prowell appealed from the summary judgment in favor of Children's Hospital; that appeal is designated as case no. 1041131. Prowell also appealed from the denial of her motion for a new trial following the judgment entered on the jury verdict for Dr. Brock and Pediatric Anesthesia Associates; that appeal is designated as case no. 1041493.
In her appeal challenging the summary judgment for Children's Hospital, Prowell asserts the following issues:
"I. Whether the Children's Hospital in its motion for summary judgment made a prima facie showing by substantial evidence" that there was no genuine issue of material fact as to whether CRNA Gaston's alleged negligence was the proximate cause of Holley's injuries?
"II. Assuming, arguendo, that Children's [Hospital's summary-judgment] motion shifted the burden to the plaintiff, whether the plaintiff's response presented substantial evidence [creating a genuine issue of material fact] of a breach of the standard of care that was causal in the decedent's injuries and death?"
(Prowell's principal brief in case no. 1041131, at p. 5.)
In her appeal against Dr. Brock and Pediatric Anesthesia Associates, Prowell asserts the following issues:
"I. Whether the trial court erred when it prohibited the plaintiff from asking questions about or offering testimony from previously identified trial experts for [Dr. Brock] who had been deposed and listed as a trial witness?
"II. Whether the trial court erred when it charged the jury that a doctor is entitled to rely upon the opinion of another physician in good standing when the standard of care requires that an anesthesiologist must confirm the placement of the ventilation tube?"

Facts
On September 25, 1998 (approximately a month before her scheduled surgery), Holley was prescreened for anesthesia by a CRNA employed by Children's Hospital. That CRNA reviewed Holley's medical data and interviewed and examined Holley. The CRNA then created a prescreen report on Holley. It appears from notes on that prescreen report that the CRNA also interviewed Holley's mother. Among other things, that prescreen report indicated "trouble [with] airway according to mom." *122 The prescreen report also indicated "small airway, limited mouth opening," and "difficult mask but saturation okay."[2] Dr. Mackall reviewed the CRNA's prescreen report and "signed off" on it.
On the morning of Holley's surgery, another CRNA ("CRNA Knight") examined Holley to ensure that no significant changes had occurred since her prescreening. CRNA Knight completed a checklist and handed that checklist to Dr. Brock, a board-certified pediatric anesthesiologist and the attending anesthesiologist in charge of Holley's anesthesia that day.
In preparing for the surgery, Dr. Brock reviewed the prescreen report; she also reviewed the medical records for Holley's most recent surgical procedure, which had occurred five months earlier. According to Dr. Brock, those notes indicated to her that during that previous surgery "[the anesthesia team] had no trouble visualizing the larynx, the epiglottis, the base of the cords . . . felt so comfortable with it, not only did they put one tube in, but they took it out and put a larger tube in." She also stated that, to her, that note indicated that, although Holley was a "difficult mask," just five months earlier an inhalation induction had been the appropriate procedure for Holley.
In administering Holley's anesthetic, Dr. Brock was assisted by Dr. Singh. Ann Gaston, a CRNA employed by Children's Hospital with 29 years of experience, was also present and was a member of the anesthesia team ("CRNA Gaston"). Because CRNA Gaston was in the recovery room attending to a patient who had had surgery earlier, she did not arrive at the operating room until after Holley's anesthesia induction had begun and did not meet Holley until after the anesthesia induction had begun.
Dr. Wiatrak was Holley's ear, nose, and throat specialist and the physician most familiar with Holley's medical conditions and problems. Dr. Wiatrak was to perform the tonsillectomy procedure on Holley. Dr. Brock indicated that she and Dr. Wiatrak had worked together on surgeries involving difficult airways for years.
As the anesthesiologist in charge, Dr. Brock was responsible for formulating the anesthesia plan for Holley. Dr. Brock developed her anesthesia plan in reliance on the prescreen report, which had been prepared by a CRNA and approved by Dr. Mackall. Dr. Brock also developed her plan in reliance on Holley's most recent medical record.
Holley's surgery was the third surgery to be performed by Dr. Brock's anesthesia team (Dr. Brock, Dr. Singh, and CRNA Gaston) and by Dr. Wiatrak that morning. Dr. Brock testified that her anesthesia plan for Holley called for the team to induce sleep by "breathing Holley down" quickly and then to intubate her. This method required the anesthesia team to cover Holley's mouth and nose with a mask and have her breathe in a gaseous medication that would put her into an anesthetic sleep; at that point, the team would place a tube into Holley's trachea to ventilate her. Dr. Brock testified that if that plan was unsuccessful, Dr. Wiatrak would use a fiber-optic scope to assist him visually in intubating Holley. If the tube could not be properly placed with the aid of the fiber-optic scope, Dr. Brock planned to ask Dr. Wiatrak to perform a tracheostomy, i.e., to surgically cut an opening in Holley's trachea to allow Holley to breathe.
*123 However, Dr. Brock acknowledged that she did not discuss this three-step plan with Dr. Wiatrak on the day of Holley's surgery. She testified that she and Dr. Wiatrak had worked together for years; that he already knew that Holley was a difficult-airway patient; and that he was aware of the plan required for difficult airways. Dr. Brock did meet briefly with Dr. Singh before Holley's surgery, and they discussed the prescreen report and Dr. Brock's thoughts on the anesthesia plan.
Holley's anesthesia began at approximately 8:12 a.m.[3] Holley was "masked" with sevoflurane mixed with nitrous oxide to put her to sleep quickly.[4] After the induction began, CRNA Gaston started an I.V. on Holley. The I.V. was not started before Holley's induction as was usually done; Dr. Brock testified that the team deviated from the usual procedure because they "knew [attempting to start an I.V.] would upset [Holley] and [they] knew it would be almost impossible to start it beforehand, so [they] did the inhalation induction and got the I.V. started then so she wouldn't be aware of it."
After the induction began, Holley immediately developed a laryngospasm; Dr. Brock testified that, in a laryngospasm, "the vocal cords shut closed tight and you couldn't even pry them open." Dr. Brock explained that, without proper treatment, a patient could die from a laryngospasm because of a lack of oxygen. Dr. Brock treated Holley's laryngospasm by changing the nitrous oxide and sevoflurane to Halothane and administering lidocaine and Mivacron to open her vocal cords.[5]
After Dr. Brock administered the Mivacron, Dr. Singh made the first attempt to place Holley's endotracheal tube. The medical monitors indicate that this first attempt occurred at 8:20 a.m. When his first attempt was unsuccessful, Dr. Singh attempted to place the tube once more, but because he could not visualize what he needed to see, he handed off responsibility for the intubation to CRNA Gaston, who was more experienced in intubating patients.
CRNA Gaston then made an attempt to place the endotracheal tube. When this attempt was unsuccessful, CRNA Gaston removed the tube, "masked" Holley again with oxygen, and then again attempted to *124 intubate Holley. According to Dr. Brock, CRNA Gaston successfully intubated Holley around 8:23 a.m.[6] An end-tidal carbon dioxide ("CO2") reading was obtained, and Dr. Brock heard breath sounds. Those two factors indicated that the tube was, most likely, properly placed in the trachea. However, within a very short period, Dr. Brock noted that Holley's "end-tidal CO2" readings became intermittent. Dr. Brock became concerned about a bronchospasm. CRNA Gaston used a laryngoscope to visually determine whether the tube was still in Holley's trachea.
Because Holley's oxygen-saturation levels and her end-tidal CO2 readings were erratic, Holley's ventilation monitors began sounding. According to Dr. Brock, at approximately 8:24 or 8:25, with the monitors still sounding, Dr. Wiatrak insisted on attempting to place the tube. At the time of Holley's surgery, Dr. Wiatrak was serving as the chief of pediatric ear, nose, and throat surgery at Children's Hospital. According to Dr. Brock, Dr. Wiatrak was considered "the guy" to operate on difficult airways at Children's Hospital. According to Dr. Wiatrak, he operates on children all day every week and "rebuilds" airways; he was Holley's surgeon. Dr. Wiatrak also acknowledged that he routinely intubates patients.
Dr. Wiatrak placed Holley's tube and stated to the anesthesia team that he "was in." Dr. Brock testified that she kept asking Dr. Wiatrak about the tube he had placed, and he kept insisting that it had been properly placed in Holley's airway.
Within a minute or two of Dr. Wiatrak's placing the endotracheal tube, Holley suffered a cardiac arrest. A "code" was called and emergency resuscitative efforts were undertaken by everyone in the operating room; other hospital personnel also came to assist. Although Holley had no end-tidal CO2 readings after Dr. Wiatrak's intubation, her oxygen-saturation readings began increasing after the resuscitative efforts. According to Dr. Brock, the most important factor was Holley's oxygenation level. However, Holley's saturation readings quickly leveled off in the "70s." The fact that the saturation levels were no longer rising prompted Dr. Brock to then attempt to confirm visually whether Dr. Wiatrak had properly placed the endotracheal tube or whether Dr. Wiatrak had missed the trachea and had improperly placed the tube in the esophagus. Although there was some dispute as to the actual times recorded, some five minutes elapsed between the time Dr. Wiatrak attempted to place the endotracheal tube and the time Dr. Brock attempted to confirm visually whether the tube was properly in Holley's trachea.
Dr. Brock or CRNA Gaston discovered that Dr. Wiatrak's tube was not in the trachea and that it had been improperly placed. CRNA Gaston then attempted to place another ventilation tube. Approximately two more minutes elapsed before Holley was successfully reintubated. After the reintubation by Gaston, an end-tidal CO2 reading was immediately established. No end-tidal CO2 readings for Holley had been recorded by the "Narkomed" brand anesthesia machine from approximately 8:24 until 8:31 a.m.
Although the exact time that elapsed was disputed at trial, for approximately four to five minutes after Dr. Wiatrak's placement of the endotracheal tube, Dr. Brock did not attempt to confirm or instruct anyone else to confirm the placement of Dr. Wiatrak's tube. Although Holley showed none of the confirmatory *125 signs of ventilation typically relied upon by anesthesiologists  end-tidal CO2 readings, chest rising, or breath sounds  Dr. Brock did not use a fiber-optic scope, and she did not request a tracheostomy.
Dr. Brock acknowledged the lack of end-tidal CO2 readings, but, she stated, Dr. Wiatrak was insistent that the tube had been placed in the airway and she knew that a lack of end-tidal CO2 readings could result from causes other than improper placement of the endotracheal tube. Dr. Brock attributed Holley's lack of end-tidal CO2 readings to the bronchospasm rather than to an improperly placed endotracheal tube. Dr. Brock testified that a bronchospasm is a recognized cause of a lack of end-tidal CO2 readings despite a properly placed endotracheal tube. According to Dr. Brock, Holley appeared to respond to the treatment for a bronchospasm.
Dr. Brock also testified that she weighed the benefit to be gained from immediate verification of the endotracheal tube against the risks of discontinuing what she believed to be Holley's ongoing ventilation. In Dr. Brock's analysis, the best decision at that time and under the circumstances was to trust Dr. Wiatrak's judgment that he "was in" and to treat what she had diagnosed as a bronchospasm.
Dr. Brock did not ask Dr. Wiatrak to perform a tracheostomy because, she said, she knew he would not do so. She testified that, in response to her queries, Dr. Wiatrak kept insisting that the endotracheal tube was properly placed in Holley's airway; Dr. Brock testified that it would have been pointless to ask Dr. Wiatrak, who believed and repeatedly insisted that his endotracheal tube had been properly placed, to perform an emergency tracheostomy on Holley. Additionally, after the anesthesia team discovered that Dr. Wiatrak's tube had not been properly placed, CRNA Gaston was able to properly intubate Holley. Dr. Brock testified that if intubation was still a possibility, there was no need to ask for a measure as drastic as an emergency tracheostomy on a five-year-old child.[7] However, Dr. Wiatrak stated that if Dr. Brock had requested a tracheostomy, he would have performed one.
Dr. Brock acknowledged that ventilating Holley was her responsibility; she acknowledged that Dr. Wiatrak was not responsible for ventilating Holley and that he was not trained in operating the "Narkomed" brand anesthesia machine used in the operating room, which monitored end-tidal CO2 readings. However, Dr. Brock also testified that a patient may be properly intubated and still show no end-tidal CO2 readings, and Dr. Wiatrak, an airway specialist, insisted that he had properly placed the tube in Holley's trachea. Dr. Brock stated that she felt the most important factor was Holley's oxygenation level, and until Holley's oxygen-saturation readings leveled off in the "70s," she did not believe it was imperative to determine whether Dr. Wiatrak's tube was in the trachea or in the esophagus. Dr. Brock testified that she believed, throughout the time that Dr. Wiatrak was insisting that his tube was in place, that she was successfully treating Holley's bronchospasm.

Case No. 1041131  Appeal from Summary Judgment for Children's Hospital
"I. Whether Children's Hospital in its motion for summary judgment made a prima facie showing by substantial evidence" that there was no genuine issue of material fact as to *126 whether CRNA Gaston's alleged negligence was the proximate cause of Holley's injuries?

"We review the trial court's entry of a summary judgment de novo, and our standard of review is well settled.
"`In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact," Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was "entitled to a judgment as a matter of law." Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).' "Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997)."
Hollingsworth v. City of Rainbow City, 826 So.2d 787, 789 (Ala.2001).
In its motion for a summary judgment, Children's Hospital did not challenge Prowell on the standard of care applicable to CRNA Gaston or on Prowell's claim that CRNA Gaston had breached that standard. Children's Hospital argued only that Prowell had failed to establish a prima facie case of malpractice because, it argues, Prowell failed to establish proximate cause. The trial court agreed and entered a summary judgment for Children's Hospital on that basis.[8] Because Children's Hospital does not challenge Prowell's assertion as to the applicable standard of care and her claim that a breach of that standard occurred, we address only the issue of proximate causation.
To establish a cause of action for medical malpractice, a plaintiff must establish, generally by expert testimony: (1) the appropriate standard of care, (2) a breach of that standard of care, and (3) a proximate causal connection between the defendant doctor's act or omission constituting the breach and the injury sustained by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala.1991). Unless "the cause and effect relationship between the breach of the standard of care and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation," a plaintiff must establish causation through expert testimony. Cain v. Howorth, 877 So.2d 566, 576 (Ala.2003). See also Golden v. Stein, 670 So.2d 904, 907 (Ala.1995) ("In most medical malpractice cases, proximate cause must be established by expert testimony."). The medical-malpractice claims asserted *127 against Children's Hospital in this case are not so readily understood by a layperson that the issue of causation may be established without expert testimony. Therefore, Prowell was required to present expert testimony in order to establish causation.
Additionally, causation is an element of a plaintiff's prima facie case in a medical-malpractice action. Unless Prowell established this element, she could not establish her prima facie case. The sole basis of Children's Hospital's summary-judgment motion was that, although Prowell was required to establish proximate cause through expert testimony, Prowell had "failed to present any expert testimony that any act or omission of [CRNA Gaston] proximately caused or contributed" to Holley's injury or death.
In opposing Children's Hospital's motion for a summary judgment, Prowell submitted the affidavit of Dr. Miles Dinner, her expert anesthesiologist. In his affidavit, Dr. Dinner addressed the alleged breaches that occurred in the operating room during Holley's surgery. However, Dr. Dinner did not specifically address acts or omissions by CRNA Gaston. Children's Hospital responded by arguing that Dr. Dinner's affidavit did not establish causation against Children's Hospital. After a hearing, the trial court granted Children's Hospital's motion and later overruled Prowell's motion to reconsider.
On appeal, Prowell argues that the trial court improperly entered a summary judgment for Children's Hospital because, she says, Children's Hospital failed to meet its burden of proof. Prowell argues that, as the summary-judgment movant, it was first incumbent upon Children's Hospital to offer affirmative evidence indicating that CRNA Gaston's acts or omissions were not the cause of Holley's injuries before the burden of proof shifted to Prowell, the nonmovant, to rebut that evidence. (Prowell's brief, at p. 27.) Prowell argues that Children's Hospital has confused Prowell's burden of proof at trial with Children's Hospital's burden of proof, as the movant, on a motion for a summary judgment. Prowell asserts that, because Children's Hospital did not negate the existence of causation in its summary-judgment motion, the burden never shifted to Prowell to present expert testimony in support of causation. For the following reason, we disagree. We conclude that Children's Hospital produced sufficient evidence to shift the burden to Prowell.
In Ex parte General Motors Corp., 769 So.2d 903 (Ala.1999), this Court addressed this very issue, stating:
"`The manner in which the movant's burden of proof is met depends upon which party has the burden of proof (Justice Brennan's "burden of persuasion") at trial. If the movant has the burden of proof at trial, the movant must support his motion with credible evidence, using any of the materials specified in Rule 56(c), [Ala.] R. Civ. P. ("pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits.") The movant's proof must be such that he would be entitled to a directed verdict if this evidence was not controverted at trial.
"`If the burden of proof at trial is on the nonmovant, the movant may satisfy the Rule 56 burden of production either by submitting affirmative evidence that negates an essential element in the nonmovant's claim, or, assuming discovery has been contemplated, by demonstrating to the trial court that the nonmovant's evidence is insufficient to establish an essential element of the nonmovant's claim. . . .
"`". . . . "

*128 "`The nonmovant may defeat a motion for a summary judgment that asserts that the nonmovant has no evidence to establish an essential element of his claim by directing the trial court's attention to evidence of that essential element already in the record, that was ignored or overlooked by the movant, or may submit an affidavit requesting additional time for discovery, in an attempt to obtain some evidence of that essential element of the claim in accordance with Rule 56(f), [Ala.] R. Civ. P.
"`If the nonmovant cannot produce sufficient evidence to prove each element of its claim, the movant is entitled to a summary judgment, for a trial would be useless.'"
769 So.2d at 909 (quoting and approving language from Justice Houston's special writing in Berner v. Caldwell, 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially), as a correct statement of the law).
As the plaintiff, Prowell had the burden of proof at trial to establish a prima facie case of medical malpractice. Thus, under the rationale of Ex parte General Motors, supra, Children's Hospital was entitled to demonstrate, on its summary-judgment motion, that Prowell's evidence failed to establish an essential element of her prima facie case, i.e., proximate cause.
In its summary-judgment motion, Children's Hospital challenged Prowell's prima facie case. This challenge was sufficient to shift the burden of proof to Prowell to come forth with substantial evidence causally linking CRNA Gaston's breaches of the standard of care to the injuries Holley suffered. We conclude that Children's Hospital properly supported its motion for a summary judgment and that the burden of proof then shifted to Prowell to present substantial evidence creating a genuine issue of material fact as to proximate cause.
Having determined that the burden of proof shifted to Prowell, we must next determine whether, in responding to the summary-judgment motion, Prowell rebutted Children's Hospital's showing. Prowell presented the affidavit testimony of Dr. Dinner, an anesthesiologist, to address the causation issue. Dr. Dinner testified:
"There were multiple failed attempts at intubation over a protracted period of time from 8:10[[9]] until 8:31 when the child was finally intubated with ventilation being provided. At 8:35, according to the medical records, [Holley] suffered a cardiac arrest. In my opinion, this cardiac arrest was due to protracted oxygen deprivation and lack of oxygen ventilation. After her arrest, extensive resuscitation efforts then ensued in the operating room and she was finally revived. However, as the records reflect, [Holley] suffered extreme brain damage and was left in a vegetative state at that point. She thereafter was required to have a permanent tracheotomy tube placed for breathing and to be fed through a tube in her stomach. She remained in this vegetative state for a little over three years, at which time she died in November of 2001. . . .
"It is and has been my opinion that [Holley's] injury occurred in the operating room on October 21, 1998 during the multiple failed attempts at intubation and ventilation of the child. Dr. Vijah Singh made two attempts to view the cords in the early part of the procedure at a time when oxygen saturations were sufficiently high to preclude injury at that point. However, the continued desaturation of [Holley's] oxygen levels *129 and the failure to have adequate carbon dioxide exchange, all evidence lack of ventilation for the child. After Dr. Singh's attempt, there were two failed attempts at intubation by [CRNA] Gaston. Though one of these was thought to be placed properly, it failed to provide adequate ventilation, and further delay ensued before the child was properly ventilated. Finally, according to the records and Dr. Brock's testimony, at approximately 8:24, Dr. Wiatrak, the surgeon, attempted an intubation of the child. That placement failed to provide ventilation for the child. There was then further delay in response even though the anesthesia machine failed to show confirmatory carbon dioxide exchange. According to the records, in addition to this lack of confirmation either from the anesthesia machine, breath sounds or the chest rising, Dr. Brock and [CRNA] Gaston made visual confirmation that Dr. Wiatrak's tube was not properly placed at 8:29. At this point, five minutes had ensued since Wiatrak's initial attempt. Finally, another two minutes occurred before [CRNA] Gaston ultimately places an endotracheal tube in the child at 8:31. The data from the anesthesia machine showed finally that this tube was ventilating the child, even though subsequent examination showed that it had been placed into one lung rather than ventilating both.
"In any event, the delay in providing ventilation to this child over that protracted period of time resulted [in] and caused, in my opinion, . . . the expected medical consequences of a cardiac arrest. That arrest occurred at 8:35. According to the anesthesia record and printout provided, [Holley] had extremely low oxygen saturations from 8:17 and for many minutes thereafter. Furthermore, there is no record of carbon dioxide exchange, except on two occasions after that period. All of these show the child is not being properly ventilated. It would be my opinion that any action during that time frame that lead [sic] to a delay in providing ventilation or in failing to respond to this lack of ventilation to this child would have contributed to her hypoxia and ultimately the cardiac arrest and brain damage that she incurred. These are recognized medical complications from the deprivation of oxygen."
We have recognized that in establishing causation:
"`The proof must go further than merely show that an injury could have occurred in an alleged way  it must warrant the reasonable inference and conclusion that it did so occur as alleged  and the inference merely that it could so occur does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'"
McAfee v. Baptist Med. Ctr., 641 So.2d 265, 267 (Ala.1994) (quoting McKinnon v. Polk, 219 Ala. 167, 168, 121 So. 539, 540 (1929)). Although we concede that the issue presented by this case is a close one, we conclude that Dr. Dinner's testimony sufficiently established causation for the purpose of rebutting Children's Hospital's motion for a summary judgment.
Although Dr. Dinner's testimony is not specific to CRNA Gaston, it is more than sufficient to create a question of fact as to whether the acts and omissions that occurred in the operating room on October 21, 1998, were the proximate cause of Holley's injuries. Children's Hospital did not dispute that CRNA Gaston was in the operating room on October 21, 1998, and that she breached the applicable standard of care. Thus, Dr. Dinner's testimony establishes *130 that the breaches that occurred that day in the operating room, including CRNA Gaston's breaches, very likely caused Holley's injuries.
We conclude that, under the facts of this case, this proof is sufficient to "`warrant the reasonable inference and conclusion that [Holley's injuries] did so occur as alleged.'" McAfee, 641 So.2d at 267 (quoting McKinnon v. Polk, 219 Ala. at 168, 121 So. at 540). We conclude that this evidence sufficiently overcame Children's Hospital's showing in support of its motion for a summary judgment.
Children's Hospital was not entitled to a summary judgment. Therefore, in case no. 1041131 we reverse the summary judgment entered in favor of Children's Hospital and remand the case, based upon the actions of CRNA Gaston, for further proceedings consistent with this opinion.[10]

Case No. 1041493  Jury Verdict in Favor of Dr. Brock and Pediatric Anesthesia Associates, P.C.
"Whether the trial court erred when it prohibited [Prowell] from asking questions about or offering testimony from previously identified trial experts for [Dr. Brock] who had been deposed and listed as a trial witness?"
As to her appeal against Dr. Brock and Pediatric Anesthesia Associates, P.C., Prowell first argues that the trial court erred when it overruled her motion to call Dr. Raeford Brown, initially deposed as a witness for Dr. Brock and Pediatric Anesthesia Associates, as an expert witness through the use of his deposition at the trial. We review this issue to determine if, in overruling Prowell's motion, the trial court exceeded its discretion. In Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005), this Court stated:
"The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is `largely discretionary with the trial court, and that court's judgment will not be disturbed absent an abuse of discretion.' Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002). We now refer to that standard as a trial court's `exceeding its discretion.' . . . However, the standard itself has not changed."
Dr. Brown, an anesthesiologist, was originally identified as a potential expert witness for Dr. Brock and Pediatric Anesthesia Associates. Dr. Brown's deposition was taken; that testimony was unfavorable to Dr. Brock. Thereafter, Dr. Brock and Pediatric Anesthesia Associates withdrew Dr. Brown's name from their list of potential witnesses.
Subsequently, the parties submitted their pretrial witness disclosures. Before he was dismissed from this case, Dr. Wiatrak indicated in his disclosures that he planned to call as a potential witness "any and all witnesses who were deposed in connection with this case." Children's Hospital stated in its disclosures that it intended to call "any witness identified by any other party" and "any person deposed in this case." In their witness disclosures, Dr. Brock and Pediatric Anesthesia Associates indicated that they intended to call, among others, "any witness identified by any other party." Prowell indicated on her witness disclosures that she intended *131 to call at trial "any witnesses and experts listed by any of the other parties to this litigation" and "any witnesses necessary for rebuttal." Thus, Dr. Brown's name was not specifically identified by any of the parties as a potential witness.
In a motion in limine filed at the beginning of the trial, Dr. Brock and Pediatric Anesthesia Associates requested, among other things, that the trial court preclude Prowell's counsel from mentioning Dr. Brown's testimony and from using Dr. Brown's deposition testimony at trial. The trial court preliminarily granted this motion, subject to review and modification as the trial proceeded. Several days into the trial, Prowell filed a written motion seeking to read portions of Dr. Brown's deposition testimony into the transcript; Prowell's counsel represented that Dr. Brown's testimony was being offered to bolster Dr. Dinner's testimony and to contradict Dr. Brock's testimony. Prowell also wanted to reveal that Dr. Brown had been retained by Dr. Brock and Pediatric Anesthesia Associates as an expert but had then been rejected as a witness on their behalf.
Dr. Brock and Pediatric Anesthesia Associates opposed Prowell's motion, arguing that once they withdrew Dr. Brown's name from their witness list and no one else had named him as a potential witness, Dr. Brown had become a "consultant" for the defense and, therefore, his deposition was not subject to use at trial.
Dr. Brock and Pediatric Anesthesia Associates also argued that even if Dr. Brown's deposition was generally admissible, nothing in his deposition testimony established that he was licensed in any state, that he was board-certified in anesthesiology, or that he practiced in that specialty during the year preceding the alleged breach of the standard of care, as required for an expert witness under § 6-5-548, Ala.Code 1975, a part of the Alabama Medical Liability Act. Therefore, Dr. Brock and Pediatric Anesthesia Associates argued, there was no way to authenticate, by the simple reading of Dr. Brown's deposition at trial, that Dr. Brown qualified as a "similarly situated health care provider," as required to testify as an expert against Dr. Brock and Pediatric Anesthesia Associates. See § 6-5-548, Ala.Code. 1975.
Dr. Brock and Pediatric Anesthesia Associates also argued that Dr. Brown's testimony would be cumulative and an unnecessary waste of time during the trial and would require their counsel to review, mid-trial, 201 pages of deposition in order to rebut and impeach Dr. Brown's deposition testimony. For any or all of these reasons, Dr. Brock and Pediatric Anesthesia Associates argued, Dr. Brown's deposition was unreadable at trial.
Without stating the basis of its ruling, the trial court overruled Prowell's motion. Prowell then supplemented her motion with additional written information regarding Dr. Brown's background, to which the trial court responded that its ruling had not been predicated simply on the basis of Dr. Brown's qualifications and again overruled the motion.
On appeal, Prowell argues that this ruling constituted reversible error because, she argues, she properly preserved her right to call Dr. Brown as a witness. Additionally, Prowell argues that Dr. Brown's testimony has "direct bearing on the outcome determinative issues facing the jury"; thus, she argues, his testimony was not merely cumulative and should have been admitted. (Prowell's brief in case no. 1041493, at p. 33.)
We find no error in Prowell's disclosures relating to her use of Dr. Brown as a witness. Prowell plainly indicated *132 that she intended to call "any witnesses and experts listed by any of the other parties to this litigation." Other parties to this litigation had already indicated that they intended to call "all witnesses who have been deposed in this case." Dr. Brown's deposition was taken in this case; therefore, Prowell's witness disclosures included Dr. Brown.
Additionally, Prowell indicated that she would call "any witnesses necessary for rebuttal." Prowell indisputably attempted to use Dr. Brown's testimony to rebut Dr. Brock's and Pediatric Anesthesia Associates' claims. For these reasons, we conclude that Prowell gave adequate notice in the pretrial witness disclosures that she might call Dr. Brown as a witness.
Prowell also argues that Dr. Brown's testimony was not merely cumulative. We agree. As Prowell argues in the briefs she filed with this Court, Dr. Brown's testimony was highly relevant to the pivotal issue of this case: whether Dr. Brock breached the standard of care owed by her to verify the proper placement of the endotracheal tube during Holley's surgery. Dr. Brown had authored an article in a peer-review journal on detecting the placement of an endotracheal tube in the esophagus as opposed to the trachea; no other witness called at the trial had written such an article. Dr. Brown's testimony concerning end-tidal CO2 monitoring as the absolute standard of care for anesthesiologists and his testimony explaining why end-tidal CO2 monitoring is superior to measuring oxygen-saturation levels as a means of determining proper placement of an endotracheal tube is directly opposed to the defense theories presented by Dr. Brock and Pediatric Anesthesia Associates in this case. Therefore, Dr. Brown's testimony was highly relevant.
Additionally, with respect to the key issue whether Dr. Brock should have been alerted to the misplacement of the endotracheal tube by the fact that the "Narkomed" brand anesthesia machine was not indicating the presence of an end-tidal CO2 reading for a period of seven minutes, Dr. Brock and Pediatric Anesthesia Associates point to only one other witness who testified regarding that issue: Dr. Dinner. Dr. Brock and Pediatric Anesthesia Associates do not indicate that any other witness discredited Dr. Brock's testimony regarding the proper or best method of monitoring a patient's ventilation. Given the highly relevant nature of this testimony, Dr. Brown's expertise on this key issue, and the fact that only one other witness testified to these same facts, we cannot characterize Dr. Brown's testimony as cumulative.
However, we find merit in Dr. Brock and Pediatric Anesthesia Associates' argument that Dr. Brown's deposition testimony was not admissible. In order to be admissible at trial, Dr. Brown's deposition testimony must have established that he qualified as a "similarly situated health care provider," as required under § 6-5-548(c), Ala.Code 1975. In her brief to this Court, Prowell did not address whether Dr. Brown's deposition testimony qualified him as a "similarly situated health care provider." Because Prowell has pointed us to nothing in Dr. Brown's deposition testimony to indicate that he is a licensed physician, that he is board-certified in the same specialty as Dr. Brock, or that he has practiced as an anesthesiologist within the 12-month period preceding Holley's surgery, we presume his deposition testimony does not address these credentials.
Additionally, although Prowell's counsel offered a written copy of Dr. Brown's curriculum vitae in an attempt to establish his credentials, Prowell could not properly authenticate Dr. Brown's credentials in this manner. Thus, simply by reading Dr. *133 Brown's deposition testimony, Prowell could not establish before the jury that Dr. Brown was qualified to testify as a "similarly situated health care provider." For this reason, the deposition testimony, as offered in this action, was inadmissible. The trial court properly excluded the reading of Dr. Brown's testimony at trial.
"Whether the trial court erred when it charged the jury that a doctor is entitled to rely upon the opinion of another physician in good standing when the standard of care requires that an anesthesiologist must confirm the placement of the ventilation tube?"
Prowell next argues that the trial court erred in giving the following instruction to the jury:
"A physician such as Dr. Brock is under a duty to inform herself of the condition of her patient, but she is justified in accepting as correct the diagnosis of the preliminary examination of another physician in good standing and she may act thereon."
This instruction tracks, almost verbatim, Alabama Pattern Jury Instruction  Civil 25.01, entitled "Duty of Physician to Patient  Reliance on Other Physician." That instruction states:
"The physician is under a duty to inform himself of the condition of his patient, but he is justified in accepting as correct the diagnosis or preliminary examination of another physician in good standing and he may act thereon."
Prowell argues that this instruction was misleading and incorrect as applied to the facts of this case. Prowell argues that the very heart of her case was that Dr. Brock breached the standard of care in ventilating Holley; Prowell argues that Dr. Brock breached that standard of care by relying on Dr. Wiatrak's placement of the endotracheal tube rather than verifying herself that the tube had been properly placed. Prowell also argues that Dr. Brock breached that standard of care when she ignored the confirmatory data indicating that Holley was not properly ventilated. Prowell argues that the undisputed standard of care places the burden on the attending anesthesiologist to promptly confirm that the endotracheal tube has been properly placed and that, in this case, Dr. Brock did not conform to that standard.
Thus, Prowell alleges that Dr. Brock was not entitled to rely on Dr. Wiatrak's assessment and that by instructing the jury otherwise, the trial court gave an instruction that was misleading and confusing based on the evidence in the case. Prowell argues that the giving of this instruction was reversible error.
"It is a basic tenet of Alabama law that `a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, . . . and the [trial] court's failure to give those instructions is reversible error.' Alabama Farm Bureau Mut. Ins. Service, Inc. v. Jericho Plantation, Inc., 481 So.2d 343, 344 (Ala.1985). (Citations omitted.) `It is the duty of the trial judge to educate the jury on the law of the case.' Grayco Resources, Inc. v. Poole, 500 So.2d 1030, 1033 (Ala.1986). As the Court in Grayco observed:
"`It is the inescapable duty of the trial judge to instruct the jurors fully and correctly on the applicable law of the case, and to guide, direct and assist them toward an intelligent understanding of the legal and factual issues involved in their search for the truth.'
"Id. (Citations omitted.)"
Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 384 (Ala.1993). In Volkswagen, this Court also stated: "Our standard *134 for reviewing the trial court's instructions is plain. `In reviewing instructions to determine if they correctly set forth the applicable law, [this Court] must read and consider the charge as a whole.'" 628 So.2d at 384-85 (quoting Grayco Res., Inc. v. Poole, 500 So.2d 1030, 1033 (Ala.1986)).
We have also stated:
"`When a trial court's oral charge is a correct statement of the law, there is no reversible error. . . . We further note that in our review of alleged error, where the objected portion of an oral charge is misleading, abstract or incomplete, reversible error will be determined only from a review of the entire instruction.'"
Meyer v. Wal-Mart Stores, Inc., 813 So.2d 832, 837-38 (Ala.2001) (quoting Griggs v. Finley, 565 So.2d 154, 160 (Ala.1990)).
This Court is also guided by Rule 45, Ala. R.App. P., which provides:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
We apply these rules to the jury instruction provided in this case. Among other things, the trial court instructed the jury as follows:
"Now, witnesses have been allowed to testify in this case as experts. And these witnesses have been permitted to express opinions and draw conclusions. An expert witness is one who by education, training, and experience has attained some skill, knowledge or experience of some science, profession, business, or occupation not of common knowledge to the average layman. In passing upon the facts you are not required to accept the conclusions or expressed opinions of these expert witnesses, but you must determine for yourselves the weight to be given to such expert testimony and evidence when considered in connection with all of the other evidence in the case. Witnesses have testified in the case as experts and have expressed opinions based upon assumed facts which were set forth in hypothetical questions. The weight to be accorded to such testimony is dependent entirely upon the truth of the material fact stated in the hypothetical questions, and before considering the opinions of the expert, you should first examine carefully all of the material facts stated in a hypothetical question and be reasonably satisfied that they have substantially been proven to be true.
"The plaintiff's claims arise out of the care and treatment of Keiterica Holley on October 21, 1998. The plaintiff claims that the defendant, Dr. Kathryn Brock, was a pediatric anesthesiologist and the plaintiff's decedent, that is, Keiterica Holley, was a patient of Dr. Brock's at the time of the incident in question. The plaintiff further claims that Dr. Brock breached the standard of care required of a pediatric anesthesiologist and further claims that Keiterica Holley was probably injured and died as a proximate result of such alleged breach of the standard of care. Dr. Brock denies the claims of the plaintiff.
". . . .
"The standard of care of an anesthesiologist such as Dr. Brock is that level of such reasonable skill, diligence, and care *135 as other similarly situated anesthesiologists in the same general line of practice ordinarily have and exercise in like cases. A breach of the standard of care is the failure by an anesthesiologist to comply with the standard of care, which failure probably causes personal injury or death.
". . . .
"The duty of a physician such as Dr. Brock to a patient such as Keiterica Holley is that the physician must use such reasonable care, skill, and diligence as other physicians in the same general neighborhood and in the same general line of practice have and exercised in like cases. The same general neighborhood means the national medical neighborhood of reasonably competent anesthesiologists in the same line of practice acting in the same line or similar circumstances.
"A physician such as Dr. Brock is under a duty to inform herself of the condition of her patient, but she is justified in accepting as correct the diagnosis of the preliminary examination of another physician in good standing and she may act thereon.
"You have heard evidence in this case concerning alternative methods of treatment. If Dr. Brock in her treatment of Keiterica Holley had available to her different or alternative methods of treatment and each of those methods was within the standard of care practiced by other anesthesiologists in the same general line of practice, the mere fact that a bad result was obtained by the method used by Dr. Brock cannot be a basis for imposing liability on her. On the other hand, you may impose liability if you are reasonably satisfied by substantial evidence that the method used by Dr. Brock in her treatment of Keiterica Holley was below the applicable standard of care as I have previously explained that standard of care to you or that the method used was within the standard of care but that Dr. Brock was negligent or below the standard of care in carrying out that method."
After reviewing the instructions as a whole, we agree with Prowell: under the facts of this case, the instruction regarding Dr. Brock's right to rely on Dr. Wiatrak's assessment of the intubation was misleading and confusing to the jury. This instruction removed from the jury's consideration one of the pivotal issues in the case  whether, by relying on Dr. Wiatrak's oral assessment of the intubation, Dr. Brock's actions fell below the standard of care applicable to her in caring for Holley and in monitoring her ventilation during the surgery that occurred on October 21, 1998. Because the jury instruction stated that Dr. Brock was entitled to rely on Dr. Wiatrak's assessment, the instruction did not allow the jury to determine whether, in light of the evidence submitted to them, Dr. Brock breached the applicable standard of care by failing to verify herself that Holley was properly ventilated. This issue was for the jury to decide.
Thus, under the facts of this case, the instruction to the jury  that Dr. Brock was entitled to rely on Dr. Wiatrak's assessment of Holley's situation  was misleading and confusing because the instruction removed from the jury's consideration one of the pivotal issues in the case. For this reason, we reverse the judgment entered by the trial court on the jury's verdict, and we remand the claims against Dr. Brock and Pediatric Anesthesia Associates for a new trial.

Conclusion
In case no. 1041131, we reverse the summary judgment entered in favor of Children's Hospital. In case no. 1041493, we reverse the judgment entered on the jury's verdict in favor of Dr. Brock and Pediatric *136 Anesthesia Associates. We remand the case to the trial court for further proceedings consistent with this opinion.
1041131  REVERSED AND REMANDED.
LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
NABERS, C.J., recuses himself.
1041493  REVERSED AND REMANDED.
SMITH, BOLIN, and PARKER, JJ., concur.
LYONS, HARWOOD, and WOODALL, JJ., concur specially.
NABERS, C.J., recuses himself.
HARWOOD, Justice (concurring specially).
I concur as to case no. 1041131.
I concur specially as to case no. 1041493. I agree that the trial court's giving of an instruction tracking Alabama Pattern Jury Instruction-Civil 25.01, was error requiring reversal under the particular circumstances of this case.
"While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous. In those situations, trial courts should deviate from the pattern instructions and give a jury charge that correctly reflects the law to be applied to the circumstances of the case."
Ex parte Wood, 715 So.2d 819, 824 (Ala. 1998). See also Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319, 330 (Ala.2000).
LYONS and WOODALL, JJ., concur.
NOTES
[1] After Holley's death, Prowell was named as the administratrix of Holley's estate and the action continued.
[2] Dr. Brock testified that this comment indicated to her that Holley "was difficult to mask but that her saturations were fine and they had no trouble intubating her" in previous surgeries.
[3] There was much discussion at trial about the times shown in the medical records for various events relating to Holley's surgery. The times recorded by personnel in the operating room, who relied on the wall clock in the room, did not match exactly the times shown on the machine-generated reports from the monitors used in the operating room. There appeared to be approximately three minutes' difference between the clock and the monitoring equipment. At the trial, some of the records were adjusted by three minutes, while other records were not adjusted. For this reason, it is difficult to discern from the record the exact time of the events that occurred in the operating room.
[4] We presume sevoflurane is a medication intended to induce sleep. Dr. Brock explained that the addition of nitrous oxide to the sevoflurane caused the sevoflurane to take effect more quickly. According to her medical records, Holley received nitrous oxide in each of the five surgeries that occurred before this one.
[5] According to Dr. Dinner, Mivacron paralyzes the patient; once Mivacron is administered, a patient cannot breathe on his or her own for 9 to 20 minutes. However, Dr. Brock testified that Mivacron did not last as long as the manufacturer indicated in the inserts provided with the medication. The testimony at trial also established that the alternative medication to Mivacron was succinylcholine, a muscle relaxer. In 1998, the Food and Drug Administration had issued "black box" warnings about the use of succinylcholine in children; the risks associated with its use were sudden cardiac arrest and death.
[6] It is unclear if this time was recorded from the wall clock or from the monitor, or if this time had already been adjusted to reflect the three-minute difference between the two.
[7] One of Dr. Brock's associates had indicated in Holley's medical records that, because of her difficult airway, Holley might require a tracheostomy when undergoing future anesthesia.
[8] In its order, the trial court stated that Prowell had failed to show by substantial evidence that a genuine issue of material fact existed as to whether CRNA Gaston's alleged negligence on October 21, 1998, probably caused Holley's injuries.
[9] See note 3.
[10] In her complaint, Prowell also alleged that Children's Hospital had failed to inform her that Dr. Singh, an "anesthesiologist fellow," who was still in training, would be treating Holley. The trial court ruled against Prowell on that issue, and Prowell did not appeal from that aspect of the trial court's order. Therefore, we do not address that issue in this opinion; we remand the case for a reconsideration of only the claims asserted against Children's Hospital that are based upon the acts or omissions of CRNA Gaston.