979 So.2d 24 (2007)
PAVILION DEVELOPMENT, L.L.C.
v.
JBJ PARTNERSHIP.
No. 1040967.
Supreme Court of Alabama.
August 10, 2007.
*25 H. Carey Walker III of Adams & Walker, P.C., Huntsville, for appellant.
Jesse P. Evans III and Henry J. Walker, Jr., of Adams & Reese, LLP/Lange Simpson, Birmingham, for appellee.
BOLIN, Justice.
Pavilion Development, L.L.C., formerly known as John Lary, L.L.C., appeals a judgment for JBJ Partnership ("JBJ") in this litigation to enforce a statutory right of redemption with respect to certain realty purchased by JBJ in a foreclosure sale. We reverse.

I. Facts and Procedural History

In August 1991 Pace Properties, an Alabama general partnership ("Pace"), sold Gallop Enterprises, Inc. ("Gallop"), approximately 22 acres of unimproved real property located in Madison County. At the time of that sale, Gallop executed a promissory note for $1,439,010 in favor of Pace; this note was secured by a mortgage on the undeveloped realty. Thereafter, Gallop incurred expenses in developing the subject property for residential use. However, before the property could be fully developed and before it paid the promissory note to Pace, Gallop, in February 1994, filed for bankruptcy under Chapter 11 of the Bankruptcy Code.
After it filed its petition in bankruptcy, Gallop and its creditors, in April 1995, agreed to restructure Gallop's financial obligations and allow Gallop to continue the residential development of the property ("the restructure"). Richard Tracey was Gallop's principal manager at the time of the restructure; Tracey's wife was at that time the president of Gallop and *26 owned all of its stock. At the time of the restructure, the respective obligations of Gallop, Tracey, and Pace were restated in a comprehensive set of documents ("the settlement documents"). The settlement documents included an April 26, 1995, settlement agreement signed by all parties interested in Gallop's bankruptcy filing ("the settlement agreement"), a promissory note for a $47,500 loan Pace made to Tracey and Gallop to allow Tracey to purchase his wife's stock in Gallop; an agreement under which Tracey, as security for the $47,500 loan, pledged to Pace the Gallop stock Tracey intended to acquire from his wife ("the stock-pledge agreement"); and an irrevocable stock power in which Tracey appointed Pace as his attorney-in-fact to sell, assign, or transfer the pledged Gallop stock if Tracey or Gallop defaulted on their obligations under the settlement documents ("the stock power").
The settlement documents provided a framework for resolving all the commercial disputes concerning Gallop that were outstanding when those documents were executed. First, the settlement agreement contemplated that Gallop would complete various phases of the residential-development project (e.g., roads, utility lines, gutters, etc.) by specific dates. Second, Gallop stipulated that Pace had a valid claim against Gallop in the amount of $1,439,010. As consideration and security for Gallop's agreement to pay Pace that amount, Gallop executed a new, restated mortgage on part of the subject property in favor of Pace ("the Pace mortgage"). The Pace mortgage applied to approximately 19 acres at the development site ("the development tract").[1] The parties also stipulated that the Pace mortgage would be subordinate to a restated mortgage on the development tract that was executed in favor of another of Gallop's creditors.
Third, section 8.01(b) of the settlement agreement stated that, in the event of a default, "to the fullest extent permitted by law, [Gallop and Tracey waive] the benefit of all laws now existing or hereinafter enacted granting a right of redemption from any sale made [after a foreclosure on the Pace mortgage]. . . ." The settlement agreement also contemplated that, in the event of a default, Pace could enforce its mortgage lien and foreclose on the development tract without violating the automatic-stay provision of the Bankruptcy Code.
In June 1995 the bankruptcy court in which Gallop had filed its Chapter 11 bankruptcy petition approved the settlement documents and dismissed Gallop's bankruptcy case. After that case was dismissed, Gallop continued its development activities on the development tract. However, on December 18, 1995, Pace's counsel addressed the following correspondence to "Mr. Richard Tracey, Gallop Enterprises, Inc.":
"Dear Mr. Tracey:
"Under the terms of your agreement with Pace Properties ('Pace') dated April 26, 1995, please be advised that Pace has elected to declare you in default and proceed to foreclosure."
Thereafter, on March 22, 1996, Pace sold the development tract to JBJthe highest bidder at the foreclosure salefor $100,000.[2] The mortgage foreclosure deed stated that JBJ received title subject to "the statutory rights of redemption on the parts of those entitled to redeem as provided *27 by the laws of the State of Alabama."
During the months after foreclosure, JBJ conveyed parcels in the development tract to two transfereesAsghar D. Pourhassani and Atlantis Development Company, Inc. ("Atlantis"). Pourhassani purchased his parcel(lot 15, block 1) from JBJ on June 10, 1996. JBJ transferred other parcels to Atlantis on September 20, 1996, and on January 16, 1997.[3] Atlantis resold one of the lots it acquired from JBJ (lot 18) on January 16, 1997, to Fritz E. Nelson and Louise A. Nelson that same day.[4]
Several particularly pertinent events occurred in March 1997. On March 1, Gallop, through its president, Tracey, sent JBJ a letter expressing Gallop's intent to exercise its right of redemption on the development tract; that letter requested that JBJ furnish Gallop an itemized statement of the lawful charges JBJ had incurred in connection with the development tract. On March 9, Gallop, again acting through Tracey, sent similar written notices and requests for statements to Pourhassani and Atlantisthe parties to whom JBJ had resold lots within the development tract following the foreclosure sale.
On March 11, 1997, counsel for JBJ and Atlantis, E. Ray McKee, Jr., replied to Gallop's notices and requests for itemized statements in a letter to Tracey ("the McKee letter"). The McKee letter stated:
"RE: Your notices of redemption to Atlantis Development and JBJ Partnership
"Dear Mr. Tracey:
"I have been requested by Atlantis Development Company, Inc., and JBJ Partnership to respond to your notices of redemption. Please be advised that Gallop Enterprises, Inc., does not have a right of redemption. Gallop Enterprises relinquished this right by document recorded of record in the Probate Records of Madison County, Alabama.

"Furthermore, please be advised that pursuant to the irrevocable stock power held by Pace Properties you are no longer an officer or authorized representative of Gallop Enterprises, Inc. If you continue to represent that you are an officer of Gallop Enterprises, Inc., legal action may be taken against you.
"You are hereby given formal notice that you are in default of your agreement with Pace Properties. You have fourteen (14) days from the date of this letter, or seven (7) days after receipt of this letter, whichever first occurs, to redeem the stock of Gallop Enterprises, Inc., by payment in full of the debt, plus accrued interest, for which the stock was pledged as security. After this time, Pace Properties shall dispose of the stock."
(Emphasis supplied.) Pourhassani did not respond in writing to the notice that Gallop sent him on March 9.[5]
On March 13, 1997, Gallop, acting through Tracey, transferred its statutory right of redemption in the development tract to Lary, in consideration for $1,000.[6] The assignment and bill-of-sale instrument *28 evidencing that transfer ("the assignment") stated:
"Gallop Enterprises, Inc. does . . . hereby sell, bargain, bequeath, assign, transfer, convey, and deliver to John Lary, L.L.C. its statutory right of redemption with respect to the [development tract that was sold at a foreclosure sale held on March 22, 1996,] together with all right, title, claim, and interest it holds with respect to said statutory right of redemption. . . . "
On March 19, 199710 days after Gallop sent notice of its intent to redeem to AtlantisMcKee, counsel for Atlantis, drafted a second response to Tracey ("the supplemental response"). The supplemental response stated:
"Dear Mr. Tracey:
"Although I have been advised that you do not have any authority to claim a right of redemption, this itemization is being furnished to perfect any rights Atlantis Development Company may have. Atlantis Development purchased Lot 2, Block 2 Pavilion Phase I for $35,000.00 and Lot 12, Block 1 Pavilion Phase II for $35,000. To date the market value of improvements to Lot 2, Block 2 Pavilion Phase I is $146,700.00, and the market value of improvements to Lot 12, Block I Pavilion Phase II is $158,400.00. Upon completion of the improvements, the fair market value of the improvements shall be $163,000.00.
"This itemization is not an admission that you have any rights with respect to the subject properties."
(Emphasis supplied.)
By March 21, 1997, neither Tracey nor Gallop had paid the indebtedness owed to Pace on the $47,500 loan or cured the breach noted in the McKee letter. Accordingly, as contemplated in that letter, Pace undertook on March 21 to foreclose on the Gallop stock Tracey had pledged to secure the $47,500 loan. Pace recorded the following instrument concerning the circumstances of that foreclosure:
"BILL OF SALE OF CORPORATE STOCK
"Pace Properties, possessing the lawful right to sell, convey and otherwise dispose of all the stock of Gallop Enterprises, Inc., did offer to sell said stock on the 21st day of March, 1997, at 12:00 noon, and the only offer for said stock being that of Pace Properties, Pace Properties does hereby, in consideration of payment of the sum of one thousand dollars ($1,000.00), the receipt of which is hereby acknowledged, sell, convey and transfer all the shares of stock of Gallop Enterprises, Inc., to Pace Properties, an Alabama general partnership. . . .
"This sale is subject to the following condition:
"In the event that Richard Tracey should tender full payment of the indebtedness for which said stock was pledged on or before the 25th day of March, 1997, the purchaser herein shall convey said stock to Richard Tracey."
According to Pace, the foreclosure sale on the Gallop stock was conducted in the office of its counsel and completed by 12:30 p.m. on March 21, 1997.[7]
*29 Later that afternoon, Lary filed a declaratory-judgment action in the trial court seeking recognition and enforcement of its statutory right of redemption in the development tract. Lary joined JBJ, the general partners of Pace, Pourhassani, Atlantis, and the Nelsons as defendants in that action and requested that the trial court determine the respective rights and interests of all those parties.
Nine days after counsel for Atlantis had sent the supplemental response to Gallop, Lary advised Atlantis in correspondence dated March 28, 1997:
"Re: Ray McKee's letter dated March 19, 1997
John Lary, L.L.C. vs. JBJ Properties et al.
"Dear Sirs:
"Your attorney's letter dated March 19, 1997 is not an itemized statement of lawful charges. As you have already been informed by the Complaint in this lawsuit, incorporated herein by reference, John Lary, L.L.C. disagrees with your valuation of the claimed permanent improvements to the property in dispute, and wishes to pursue the remedies contained in the Alabama Redemption Statute and to go forward as stated in the Complaint."
In May 1997 JBJ filed a motion for a summary judgment, asserting two principal grounds: (1) that Tracey had no authority on March 13, 1997, to make the assignment, and (2) that Lary had failed to comply with various statutory prerequisites in § 6-5-247 et seq., Ala.Code 1975, necessary to exercise the right of redemption.[8] Judge Joseph Battle issued the following order on October 22, 1997:
"On all pending motions for summary judgment, the Court finds that the [March 13, 1997,] assignment of the right of redemption [by Gallop to Lary] was lawful, and that the statutory requirements for redemption have been fulfilled. . . . "
In that order, Judge Battle reserved ruling on the issues whether to revive the Pace mortgage and the extent of the unpaid debt related to that interest.
Subsequently, Judge Buddy Aderholt was assigned as the trial judge in Lary's declaratory-judgment action. In January 1999 Judge Aderholt severed Lary's declaratory-judgment action from the numerous cross-claims, counterclaims, and third-party claims the defendants had by that time asserted.[9]
*30 In June 2003, JBJ refiled its motion for a summary judgment ("the second summary-judgment motion"). Atlantis filed a motion for a summary judgment in July 2003, and Lary filed its own motion for a partial summary judgment in August 2003. As support for the second summary-judgment motion, JBJ reasserted the same grounds that the trial court had rejected in 1997. In its second summary-judgment motion JBJ briefed and argued the following five alternative grounds on which to dismiss Lary's action:
1. Tracey was without authority on March 13, 1997, to assign Gallop's right of redemption to Lary;
2. Lary was judicially estopped from denying that Gallop had waived its right of redemption;
3. Gallop failed to make a timely demand for lawful charges;
4. Gallop failed to properly appoint a referee as required by § 6-2-254, Ala. Code 1975; and
5. The deposit or tender of lawful charges by Lary was inadequate.
Although JBJ asserted these multiple grounds, Judge Aderholt later directed JBJ to send him an additional brief limited solely to the issue whether Tracey had the authority on March 13, 1997, to assign Gallop's right of redemption to Lary. JBJ complied with that request and, on February 3, 2004, filed a memorandum brief with Judge Aderholt. The introduction to that brief stated:
"JBJ Partnership filed a Motion for Summary Judgment outlining multiple theories of law in support of its summary judgment motion. This Memorandum is addressing only the following issue:

"Did Richard Tracey, on behalf of Gallop Enterprises, have authority to sign Gallop's right of redemption to the Plaintiff John Lary, LLC, now known as Pavilion Development, LLC?
"In order to make this argument concise and specific to just the above issue, we have paraphrased, copied and adopted the statement in facts and argument contained in JBJ's Motion for Summary Judgment previously filed. . . . "
(Emphasis supplied.)
Focusing exclusively on the authority-to-assign issue, Judge Aderholt granted JBJ's second summary-judgment motion and entered an order on November 4, 2004, that stated:
"[T]he Court determines that Richard A. Tracey had no authority to assign Gallop Enterprises, Inc.'s Statutory Right of Redemption, to John Lary, LLC. Therefore, the Court determines that there is no issue of material fact and that JBJ Partnership is entitled to Judgment as a matter of law.
"Accordingly, it is ORDERED, ADJUDGED and DECREED that JBJ Partnership's Motion for Summary Judgment challenging the right of John Lary, LLC, to redeem the subject property is granted. The Court further determining that there is no just reason for delay, the Complaint of John Lary, LLC, seeking redemption is hereby dismissed with prejudice."
(Emphasis supplied.)
Pavilion, as Lary's successor, filed a timely appeal seeking reversal of the judgment entered for JBJ.[10]

*31 II. Analysis

A. Standard of Review

The well-settled standard of review for a summary judgment was recently stated in RaCON v. Tuscaloosa County, 953 So.2d 321, 329 (Ala.2006):
"`This Court's review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Ala.Code 1975, § 12-21-12. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'"
(Quoting Prince v. Poole, 935 So.2d 431, 442 (Ala.2006).) When reviewing a summary judgment, this Court resolves all reasonable doubts against the movant. Prowell v. Children's Hosp. of Alabama, 949 So.2d 117 (Ala.2006).

B. Authority to Assign Right of Redemption

Pavilion's appeal focuses exclusively on one issue: whether the trial court erred in finding that "Richard A. Tracey had no authority to assign [Gallop's] [s]tatutory [r]ight of [r]edemption, to [Lary]." Although Pavilion makes various arguments concerning this issue, its fundamental position can be summarized as follows: Summary judgment for JBJ was improper because Traceythe sole officer, managing agent, director, and sole shareholder of Gallop on March 13, 1997had the authority on that date to transfer Gallop's statutory right of redemption to Lary (Pavilion's predecessor in interest).
JBJ does not question the statement that, following a foreclosure, the holder of the statutory right of redemption can assign that right to a third person. Estes v. Johnson, 234 Ala. 191, 192, 174 So. 632, 633 (1937) (person holding the right to redeem mortgaged lands may transfer that right to a "stranger to the title" who otherwise has no other interest in those lands);[11]see also Dominex, Inc. v. Key, 456 So.2d 1047, 1053-54 (Ala.1984) (reaffirming the principle that the statutory privilege of redemption can be assigned if there is an express intent to do so). Instead, JBJ argues that the assignment here was void because, it argues, Tracey did not have authority over Gallop on March 13, 1997, to assign Gallop's right of redemption. According to JBJ, by the time of the assignment, Tracey had pledged all the Gallop stock to Pace under the stock-pledge agreement that secured the $47,500 loan, had appointed Pace as his attorney-in-fact concerning that stock pursuant to the provisions of the stock power, and, with Gallop, had not performed obligations owed to Pace under the settlement documents (including the duty to repay the $47,500 loan). Given these circumstances, JBJ argues that, because of the collective operation of the settlement documents, *32 summary judgment was appropriate because, it argues, Tracey could not assign the right of redemption to Lary without Pace's consent.[12] JBJ contends that Tracey lost his authority to transact business for Gallop or to sell its assets without Pace's consent in April 1995, after he signed the settlement documents, or, at the latest, when he received the December 18, 1995, notice that he was in default of the obligations owed Pace under the restructure.
The facts relevant to the authority-to-assign issue are largely undisputed. Tracey purchased all the shares of Gallop stock from his wife in 1995; the proceeds of the $47,500 loan were paid to her as consideration for that purchase. Thereafter, Tracey was elected as the president of Gallop and served as its sole officer, director, and shareholder and as managing agent at all pertinent times.
Moreover, by March 13, 1997, counsel for Pace had sent two notices notifying Gallop and Tracey that they were in default under the settlement documents. The first notice was dated December 18, 1995, and was addressed to "Mr. Richard Tracey, Gallop Enterprises, Inc."[13] The second was the McKee letter to Tracey dated March 11, 1997.[14] Ten days after that second notice, Pace undertook to foreclose upon and sell the Gallop stock.
Pavilion did not rebut by substantial evidence the showing that Gallop and Tracey breached the obligations referenced in these two default notices. Below, we analyze each of the settlement documents to determine whether, in light of those defaults, those documents "collectively" terminated or otherwise affected Tracey's authority to make the assignment to Lary on March 13, 1997.
1. Stock-Pledge Agreement
Tracey executed a stock-pledge agreement in favor of Pace in which he pledged 100% of his Gallop stock to secure payment of the promissory note evidencing the $47,500 loan. The stock-pledge agreement provided:
"2. The pledged stock shall remain registered in the name of [Tracey] upon the books and records of [Gallop]. Provided [Tracey] is not in default under its promissory note or this agreement, [Tracey] shall retain all dividends and voting rights with respect to such stock.
"3. Upon [a] default that has not been cured after seven (7) days' notice, [Pace] within a reasonable time shall be entitled to sell the stock in an arm's length *33 transaction and apply the net proceeds to the payment of the note."
That Tracey breached his obligations to repay that note is not disputed. Thus, considering these provisions of the stock-pledge agreement, the following events were conditions precedent under this agreementand should have occurred by March 13, 1997before Pace could have acquired control over the operation and business affairs of Gallop:
1. Tracey or Gallop should have defaulted on their respective obligations under the $47,500 note or the stock-pledge agreement;
2. A defaulting party should have received notice of that default and had an opportunity to cure the default but failed to timely cure that default; and
3. Pace should have foreclosed on its secured interest in the Gallop stock.[15]
Additionally, in order to remove Tracey from his positions as president, director, and managing agent, the party with the controlling interest in Gallop following the foreclosure would have been required to follow usual corporate governance procedures to terminate Tracey's authority to act for Gallop that he possessed through his appointment to those positions.[16]
Because only one of these required stepsthe notice of default in the McKee letterhad transpired by March 13, 1997, the stock-pledge agreement did not operate to divest Tracey of his authority to complete the assignment. Further, there is no provision in the stock-pledge agreement indicating that as a result of its execution and the subsequent default Tracey would automatically relinquish his authority to transact business for Gallop on the date of default.
2. Stock Power
In the stock power, Tracey appointed Pace as his "lawful attorney-in-fact . . . to sell, assign, transfer and make over all or any part of [Gallop stock pledged by Tracey] . . . in the event of a default by [Tracey] or Gallop, Inc. in the performance of the terms and conditions of the Settlement Agreement or the Promissory Note [evidencing the $47,500 loan] or [the] Stock Pledge Agreement." On its face, this instrument authorized Pace to take necessary administerial acts attendant to transferring the Gallop stock pledged by Tracey if Pace acquired that stock as the result of a default by Gallop or Tracey in their obligations in other settlement documents.
However, we have not located, nor have we been directed to, any record maintained by Pace documenting that by March 13, 1997, Pace had actually exercised its rights under the stock power to transfer control of the Gallop stock from Tracey to itself or to a third party. Further, there was no provision in the stock power that, on the face of that instrument alone, granted Pace any extraordinary right to divest Tracey's authority to act on behalf of Gallop in the event of a default by Gallop or Tracey. Indeed, as noted above, the only evidence of Pace's intent to exercise control over the Gallop stock was its attempt to purchase that stock at its March 21, 1997, foreclosure salean event that purportedly occurred eight days after the March 13, 1997, assignment.
*34 3. Settlement Agreement
Articles 7 ("Events of Default") and 8 ("Remedies") of the settlement agreement addressed potential defaults by Gallop and Tracey of their respective obligations resulting from the restructure. Section 8.01 provided Pace multiple remedies if Gallop or Tracey defaulted "under this Agreement, or under any note or mortgage held by Pace [and that default] remain[ed] uncured for a period of ten (10) days from the date on which notice of [that default] is sent [to the defaulting party]. . . ." Those remedies included the right to foreclose on the development tract without notice, to sell the development tract to the highest bidder, and to take possession of the development tract.
However, the settlement agreement does not provide that the occurrence of the defaults discussed in the December 18, 1995, notice and the McKee letter divested Tracey of his authority to transact business for Gallop. As discussed above, the only evidence of Pace's intent to gain control over the Gallop stock that transpired before March 13, 1997the date of the assignmentwas the McKee letter. That letter initiated a process that could have culminated with Tracey's ouster from his managerial positions with Gallop and the termination of his authority, but that process was not perfected by March 13, 1997.
4. Promissory Note for the $47,500 Loan
The final settlement document pertinent to JBJ's argument is the promissory note evidencing the $47,500 loan. That note contained the following default provision:
"If default be made [by Tracey or Gallop] in the payment of any installment [due hereunder], or in the performance of any of the covenants or agreements contained in that certain Stock Pledge Agreement or Settlement Agreement of even date herewith given to secure the payment hereof, then, at the option of [Pace] and without notice to any one, the entire unpaid principal of this note with interest thereon shall become due and payable and may be collected in the same manner as if the full time provided in this note had expired. . . . "
As with the other settlement documents, there is no provision on the face of this note divesting Tracey of his authority to transact business or to sell the assets of Gallop upon the mere occurrence of a default by him or Gallop on their obligations under the restructure.
5. Summary of Effect of Settlement Documents
In summary, we disagree with JBJ's contention that the "cumulative operation" of the settlement documents was to remove or limit Tracey's authority to sell the assets of Gallop on March 13, 1997, the day of the assignment. JBJ argues, but fails to explain how, the settlement documents collectively had that effect. We have not located, nor have we been directed to, any provision in those documents that "sprung into effect" and so divested Tracey of his authority.
Instead, the settlement documents contemplate that, after a default by Gallop or Tracey, Pace was to provide the defaulting party both notice of that default and an opportunity to cure. Absent that cure by the defaulting party, cross-default provisions in the settlement documents could trigger a multitude of remedies for Pace. When the settlement documents are read together, it is clear that Pace had the right, after an uncured default, to foreclose on the Gallop stock Tracey had pledged, to sell that stock, to document a change of its ownership from Tracey to the purchaser under the stock power, to elect a new board of directors for Gallop, to oust Tracey from his management positions, and to *35 install new officers. Other than its default notices, however, by March 13, 1997, Pace had not completed any of these actions, which were required to terminate Tracey's authority to bind Gallop by that date.
JBJ also made this "collective operation" argument to the trial court. To the extent that the trial court relied on that argument in entering the summary judgment for JBJ, it erred because Pavilion presented substantial evidence indicating that a disputed issue of fact existed as to whether Tracey had the authority to transfer the statutory right of redemption to Lary on March 13, 1997.
6. Equitable Lien
Alternatively, JBJ argues that Tracey's execution of the stock-pledge agreement in 1995 granted Pace an equitable interest in Gallop. According to JBJ, "the pledge of all the stock of a corporation creates in effect an equitable mortgage on the corporate property and imposes liens [thereon]." (JBJ's brief, p. 23.) Because Pacethe pledgee of the Gallop stock held that equitable interest, JBJ contends that Pace had priority over subsequent purchasers of corporate property and that, as a matter of law, Tracey did not have the right on March 13, 1997, to sell any Gallop property (including its statutory right of redemption) without Pace's consent.
JBJ cites two decisionsBoyett v. Hahn, 197 Ala. 439, 73 So. 79 (1916), and Selma Bridge Co. v. Harris, 132 Ala. 179, 31 So. 508 (1902)as authority for this argument. In Boyett, Hahn, who owned a one-half undivided interest in the stock of a corporation, pledged that interest to secure a loan to that corporation. The pledge instrument did not provide a method to enforce that security interest. The dispute arose after the corporation defaulted on its repayment obligation; at that point, Hahn and Clark, the owner of the other one-half interest in the corporation, prohibited the trustee who then held the pledged one-half interest from participating in its business affairs. Under those circumstances, the Boyett Court held that the remedy for the trustee to enforce its security interest was to foreclose on the pledged stock, not to dissolve the corporation and sell its assets. The Court reasoned that, if the trustee first purchased the pledged one-half interest at the foreclosure, then the trustee would have the right to participate in the business affairs of the corporation.
However, neither the Boyett nor the Selma Bridge Co. Court considered the issue here: Whether the pledge of stock impacts the authority of corporate managers to conduct business. Accordingly, these authorities do not support JBJ's argument that Gallop should have obtained Pace's consent before making the assignment.[17] Indeed, Boyett supports our holding that, when corporate stock is pledged to secure the performance of an obligation, the authority of the corporation's managers to transact business is not restricted by the mere execution of a pledge instrument that, as here, does not grant the pledgee the right to approve, control, and manage its affairs.
For the reasons stated above, the trial court erred when it entered a summary judgment for JBJ based on its conclusion that Tracey lacked authority to bind Gallop at the time of the assignment of the right of redemption. Moreover, JBJ did *36 not present substantial evidence to rebut Pavilion's position that Tracey at the time of the assignment was the "sole shareholder, officer and director and managing agent of Gallop."[18] Additionally, we have not found in the record, nor have we been directed to, any corporate resolution or other governance instrument maintained by Gallop that limited Tracey's general authority to act on behalf of that corporation or that restricted his power to transfer Gallop's assets on March 13, 1997. Having considered JBJ's arguments and the uncontested facts on the authority-to-assign issue, we hold that, as a matter of law, Tracey had the authority to transfer Gallop's statutory right of redemption to Lary on March 13, 1997.

C. Failure to Comply with Statutory Requirements

As an alternative basis on which to affirm, JBJ argues that even if Tracey had the authority to transfer Gallop's right of redemption to Lary, the action by Pavilion, as Lary's successor, to perfect its right of redemption is defective because, JBJ argues, Lary did not comply with certain statutory requirements in § 6-5-247 et seq., Ala.Code 1975, related to demand, the appointment of a referee, or the deposit into court or tender of lawful charges ("the statutory requirements"). Although we have stated that an appellate court may affirm a judgment of a trial court for any valid reason,[19] we do not consider JBJ's arguments about the statutory requirements because the record here indicates that the trial court did not make any findings concerning, nor did it intend to base its judgment on, those alternative grounds.
The procedural circumstances attendant to the entry of a judgment are important. JBJ filed a brief and supporting materials in support of the second summary-judgment motion. In that brief, JBJ argued to the trial court that summary judgment was proper based on the authority-to-assign or the failure-to-comply-with-statutory-requirements grounds. Pavilion opposed all of JBJ's arguments, and submitted a brief and other materials to the trial court in opposition to JBJ's second summary-judgment motion. After receiving those submissions from the litigants, the trial court requested that JBJ submit a supplemental brief focused solely on the authority-to-assign issue. JBJ complied with that request when, on February 3, 2004, it filed a supplemental brief limited solely to the authority-to-assign issue; that supplemental brief concerning the authority-to-assign issue both expanded and refined the arguments JBJ had made previously on that ground. After receiving JBJ's supplemental brief, the trial court, on November 4, 2004, issued its six-page, written order entering a judgment for JBJ. The findings in that order addressed solely the authority-to-assign question; the order was silent as to JBJ's alternative arguments concerning the failure to comply with statutory requirements. Moreover, that order did not state that it was superseding or overruling nor did it otherwise address the trial court's October 22, 1997, order on JBJ's first summary-judgment motion in which, in pertinent part, the trial court found "that the statutory requirements for redemption have been fulfilled."[20]
*37 Under these circumstances, we are persuaded that the trial court reached and decided only the authority-to-assign issue when it entered a summary judgment for JBJ on November 4, 2004. That ruling was a threshold finding that pretermitted consideration of the failure-to-comply-with-statutory-requirements argument and all other issues raised by Lary's (now Pavilion's) complaint. Because we hold that the trial court's order was so limited, the "affirm for any valid reason" principle is inapplicable here because the record indicates that the trial court never intended to address the failure-to-comply-with-statutory-requirements argument JBJ reasserted on appeal.[21]

III. Conclusion

The trial court erred in finding that, on March 13, 1997, Traceythen the president, sole director, and managing agent of Gallophad no authority to assign Gallop's right of redemption to Lary (Pavilion's predecessor in interest). Although both Gallop and Tracey had defaulted on their obligations under the restructure before March 13, 1997, Pace had not taken by that date all the actions required to exercise control over the management of Gallop and to terminate Tracey's authority to transact business for Gallop.
For the reasons stated herein, the judgment for JBJ is reversed, and this cause is remanded to the trial court for adjudication of the respective rights and interests of the parties related to Pavilion's action to perfect its statutory right of redemption.[22]
REVERSED AND REMANDED.
STUART and PARKER, JJ., concur.
COBB, C.J., and SEE and MURDOCK, JJ., concur specially.
SMITH, J., concurs in the result.
LYONS and WOODALL, JJ., dissent.
SEE, Justice (concurring specially).
JBJ raised two arguments in the trial court to support its contention that Pavilion had no right to redeem the subject property: (1) that Tracey, the corporate manager of Gallop, lacked the corporate authority to transfer the right of redemption to Lary (renamed Pavilion during the course of this proceeding), and (2) that Pavilion, because it failed to comply with the procedures found in the redemption statute, was not entitled to redeem the property. The trial court, however, asked the parties to brief only the authority-to-assign issue, and it entered a summary judgment in favor of JBJ on that issue. Thus, the trial court apparently did not rely on JBJ's arguments regarding the redemption statute in entering its judgment. *38 Pavilion did not address that argument in its initial appellate brief. JBJ, however, raised the failure-to-comply-with-statutory-requirements argument as an alternative ground for affirming the trial court's judgment, and Pavilion did not respond to that argument in its reply brief.
In his dissent, Justice Lyons suggests that, because JBJ's argument that Pavilion has failed to comply with the redemption statute is "not frivolous on its face," this Court should affirm the trial court's judgment on the basis of Pavilion's "procedural default." 979 So.2d at 47 (Lyons, J., dissenting). I respectfully disagree because, notwithstanding the fact that this Court may affirm a judgment for a reason not considered and not argued in the trial court, I do not believe that we must affirm the judgment of the trial court on a ground that was not relied upon by the trial court, without a consideration of the merits of that ground.
As I understand the rule proposed in Justice Lyons's dissent, it would require this Court to affirm a trial court's judgment where the appellee makes an argument for affirmance that is "not frivolous on its face." Justice Lyons relies on the "`long-standing, well-established rule that [in order to secure a reversal] the appellant has an affirmative duty of showing error upon the record,'" 979 So.2d at 46 (Lyons, J., dissenting) (quoting Tucker v. Nichols, 431 So.2d 1263, 1265 (Ala.1983)), as well as this Court's decision in Fogarty v. Southworth, 953 So.2d 1225 (Ala.2006).
In Fogarty, a panel of this Court held that,
"[w]hen an appellant confronts an issue below that the appellee contends warrants a judgment in its favor and the trial court's order does not specify a basis for its ruling, the omission of any argument on appeal as to that issue in the appellant's principal brief constitutes a waiver with respect to the issue."
953 So.2d at 1232. Further, the Fogarty opinion stated that the omission of such an argument constitutes the "waiv[er of] the right to assert error with respect to that issue." 953 So.2d at 1232.[23]
In Tucker v. Nichols, supra, this Court explained the basis of the rule that the appellant bears the burden of demonstrating error on the record: "This rule is premised upon the fundamental proposition that an appellate court will not presume error and will affirm the judgment appealed from if supported on any valid legal ground." 431 So.2d at 1265. We have sometimes phrased this rule in language suggesting that it "must" be applied, see Ex parte CTB, Inc., 782 So.2d 188, 191 (Ala.2000) ("[T]his Court must affirm the judgment of the trial court if that judgment is supported by any valid legal ground, even if that ground was not argued before the trial court or this Court."), while at other times we have stated it in language suggesting that the rule "may" be applied, see Unum Life Ins. Co. of America v. Wright, 897 So.2d 1059, 1082 (Ala.2004) ("This Court may affirm a trial court's judgment on `any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court."' (quoting General Motors Corp. v. Stokes Chevrolet, Inc., 885 So.2d 119, 124 *39 (Ala.2003), quoting in turn Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003))); however, we have always held that there must be some valid legal ground supporting an affirmance.
Thus, although it is the appellant's burden to demonstrate error upon the record, and although this Court "will not presume error and will affirm the judgment appealed from if supported on any valid legal ground," Tucker, 431 So.2d at 1265, there is a caveat to those rules: "`We can affirm a judgment on a basis not asserted to the trial court, and we can affirm a judgment if we disagree with the reasoning of the trial court in entering the judgment, as long as the judgment itself is proper."' Verchot v. General Motors Corp., 812 So.2d 296, 305 (Ala.2001) (quoting Progressive Specialty Ins. Co. v. Hammonds, 551 So.2d 333, 337 (Ala.1989) (emphasis added)). As we have held, this Court's chief concern is whether the judgment being affirmed is proper and correct. "`[I]f a [judgment] correctly determines a case, the reasons on which the trial court acted are unimportant and the case will be affirmed.'" Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d 1013, 1020 (Ala. 2002) (quoting City of Montgomery v. Couturier, 373 So.2d 625, 627 (Ala.1979)); see also Ex parte Shelby County Health Care Auth., 850 So.2d 332, 339 (Ala.2002) ("[T]his Court will affirm a properly entered summary judgment, even if the trial court's reasons for entering the judgment were incorrect."); Bryant v. Moss, 295 Ala. 339, 342, 329 So.2d 538, 540 (1976) ("If the judgment or decree correctly determines the equity of the case, the reasons upon which the trial Court proceeded are unimportant and the judgment will be affirmed."). This is true because this Court affirms judgments, not the arguments of parties.
The correct standard, I believe, is that an affirmance must be based "`on [a] ground developed in, and supported by, the record.'" Lyons v. River Road Constr., Inc., 858 So.2d 257, 265 (Ala.2003) (quoting Ex parte Ramsay, 829 So.2d 146, 155 (Ala.2002)). As we have held, "[t]his Court can affirm a trial court's judgment for any reason, but only if the record on appeal evidences the fact that is the basis for the affirmance." Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 88 (Ala. 2004).
In this case, although JBJ raised two arguments in support of its motion for a summary judgment, the trial court specified only oneTracey's lack of corporate authority to assign Gallop's right of redemption as the basis of its judgment. Pavilion did not address in its initial appellant's brief JBJ's alternative argument, raised below, that Pavilion had failed to follow the procedures specified in the redemption statute. Nor did Pavilion address in its reply brief the failure-to-comply-with-statutory-requirements argument after JBJ had raised it in its appellee's brief. I agree that we may affirm the trial court's judgment on the basis of this argument, but only if the summary judgment below was proper and the failure-to-comply-with-statutory-requirements argument is supported by the record. I do not believe that this Court is bound, without consideration of the merits of the argument, to affirm the judgment below on the basis of a colorable argument raised below but not addressed by the appellant on appeal.
I concur with the main opinion because I believe that there is a genuine issue of material fact regarding Pavilion's compliance with the statutory requirements of § 6-5-247 et seq., Ala.Code 1975. I note initially that our redemption statute is to be "liberally construed in favor of redemption." *40 Watts v. Rudulph Real Estate, Inc., 675 So.2d 411, 413 (Ala.1996). JBJ argues that Pavilion did not make a timely demand for a statement of lawful charges as is required by § 6-5-252. Although Pavilion did not make a demand for lawful charges before the assignmentand therefore in time to allow the purchaser of the foreclosed property 10 days to respond before the limitations period endedthere is substantial evidence indicating that Gallop, as Pavilion's predecessor in interest, made a timely demand for lawful charges on JBJ and on the transferees of JBJ's interest, Atlantis and Pourhassani. See Reed v. Skeen, 591 So.2d 51, 53 (Ala.1991) (holding that the assignee of a right of redemption can benefit from the assignor's demand for lawful charges made to the purchaser).
JBJ argues, second, that Pavilion did not follow the procedures for appointing a referee to arbitrate the value of permanent improvements as is required by § 6-5-254. There is, however, substantial evidence indicating that Pavilion expressed its disagreement with Atlantis's statement of lawful charges and that Pavilion appointed a referee to arbitrate the value of the improvements when it filed its declaratory-judgment action. § 6-5-254, Ala.Code 1975 (requiring the redemptioner to notify the purchaser that he disagrees with the statement of lawful charges and to appoint a referee within 10 days of receiving the demand for lawful charges).
Finally, JBJ argues that Pavilion did not deposit into court an amount adequate to pay the lawful charges as required by § 6-5-256 or tender those charges as provided by § 6-5-252. I do not believe that the record supports a judgment as a matter of law in favor of JBJ on these points. Both JBJ and Pourhassani failed to provide statements of lawful charges; therefore, JBJ cannot complain that Pavilion failed to deposit or tender the lawful charges incurred by those parties. See Godfrey v. Black, 240 Ala. 151, 154, 197 So. 892, 894 (1940) (holding that a redemptioner need not tender payment when he "does not know the amount that is due and the purchaser has failed after due demand to furnish him with an itemized statement. . . ."). Although Atlantis did give a statement of lawful charges, there appears to be substantial evidence indicating that Pavilion believed those charges were exaggerated. See Ross v. Edwards, 541 So.2d 507, 509 (Ala.1989) (holding that the redemptioners "were excused from tendering to [the buyer] the amount that he had requested, as required by § 6-5-235, because they could not determine whether they owed that amount and, therefore, needed the court's assistance in determining the redemption price"). Moreover, the fact that JBJ transferred part of the property to Atlantis and Pourhassani "furnishes a sufficient excuse for a failure on the part of the redemptioner to pay or tender to the purchaser or his vendee the amount required to effectuate redemption, the purchaser by his subsequent acts having thus put it beyond the power of the redemptioner to redeem the whole tract out of court." Hazelrig v. Thomas, 291 Ala. 659, 661, 286 So.2d 830, 831 (1973).
I respectfully disagree with Justice Lyons that the failure of the appellant to confront an alternative argument in support of the judgment below necessarily requires that this Court affirm that judgment when the appellee's argument is not frivolous on its face. Such a rule would compel this Court to affirm the trial court's judgment for a possibly invalid reason not relied upon by the trial court. Further, for the reasons I have outlined, I do not believe that the summary judgment in favor of JBJ should be affirmed on the basis of JBJ's failure-to-comply-with-statutory-requirements *41 argument. Therefore, I concur with the main opinion.
MURDOCK, Justice (concurring specially).
I concur in both the result and the analysis provided by the main opinion, particularly as to the issue whether Tracey lacked authority to assign Gallop's statutory right of redemption to Lary (Pavilion's predecessor in interest). I write separately because I disagree with the recommendations in Justice Lyons's dissent that we extend the "waiver rule," recently announced in Fogarty v. Southworth, 953 So.2d 1225 (Ala.2006), to the procedural circumstances of the present case and that we "codify" that rule as part of our Rules of Civil Procedure. Further, not having been a member of this Court when Fogarty was decided, I take this opportunity to express my concerns with the waiver rule announced in that case.
Among Alabama's rules of appellate review are two well-established rules that long have worked together logically and effectively to produce fair results: (1) the rule that an appellate court "may affirm a trial court's judgment on `any valid legal ground'" presented by the record, General Motors Corp. v. Stokes Chevrolet, Inc., 885 So.2d 119, 124 (Ala.2003) (quoting Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., 881 So.2d 1013, 1020 (Ala.2003)); Spencer v. Malone Freight Lines, Inc., 292 Ala. 582, 589, 298 So.2d 20, 25 (1974) (quoting with approval from 5 C.J.S. Appeal and Error § 1464(4) as follows: "An appellate court . . . may consider any other legal ground or valid reason for the judgment and affirm the judgment where it is correct on any legal ground, even though the ground or reason stated by the lower court is erroneous.");[24] and (2) the rule that an appellate court generally will not reverse a trial court's judgment on a ground not argued on appeal, Smith v. Mark Dodge, Inc., 934 So.2d 375, 380 (Ala.2006), and, stated even more specifically, a ground for reversal generally must be raised in the appellant's initial brief, rather than for the first time in the appellant's reply brief, Steele v. Rosenfeld, LLC, 936 So.2d 488, 493 (Ala.2005); Nashville, C. & St. L. Ry. v. Abramson-Boone Produce Co., 199 Ala. 271, 274, 74 So. 350, 352 (1917) (noting that an argument not presented on submission of the cause in the original brief came too late for consideration).[25]
*42 The first of the aforesaid two rules enables an appellate court to affirm a trial court's judgment based on a ground upon which the trial court itself did not rely. The appellate court may do so, however, only when the alternative ground is determined by the appellate court to be a legally correct basis for the result reached by the trial court. (Thus the reference in the rule to "any valid legal ground.") I do not believe we should transform a rule designed to allow an appellate court to affirm a lower court's judgment on any ground determined to be valid into a rule that requires an appellate court to affirm a lower court's judgment on any ground, without regard for the validity of the ground, merely so long as that ground was raised in the trial court by the prevailing party and was not addressed by the appellant on appeal.
The need identified in Fogarty for the waiver rule announced in that case was the concern that, without such a rule, "an appellant could `sandbag' an appellee by withholding an argument on an issue until the reply brief, thereby depriving the appellee of the opportunity to respond." 953 So.2d at 1232 (footnote omitted). It would appear, however, that the very authority cited by Fogarty as support for the conclusion that a waiver rule was needed in order to prevent such "sandbagging" was a rule that, itself, already served that purpose, namely: "`It is a well-established principle of appellate review that we will not consider an issue not raised in an appellant's initial brief, but raised only in the reply brief.'" Fogarty, 953 So.2d at 1232 (quoting Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala.2005)). Insofar as I can see, the efficacy of this rule in preventing such "sandbagging" was not and is not in question.[26]
Alabama's "affirm-on-any-valid-legal-ground" rule was, and remains, simply another way of stating the rule followed not only in Alabama, but in other jurisdictions as well, that an appellate court may affirm a judgment when it is "right for any reason," 5 Am.Jur.2d Appellate Review § 829 (1995) (emphasis added), that is "when the judgment below [is] correct, even if the appellate court does not agree with the reasoning of the lower court." Id. (emphasis added). As this Court stated in South-Trust Corp. v. James, 880 So.2d 1117, 1122 (Ala.2003), "we are cognizant of the settled rule that `[t]he appellate courts will affirm *43 the ruling of the trial court if it is right for any reason. . . .' Premiere Chevrolet, Inc. v. Headrick, 748 So.2d 891, 893 (Ala.1999). . . ." (Emphasis added.) In Ex parte Wiginton, 743 So.2d 1071, 1072-73 (Ala. 1999), the Court stated the rule this way: The appellate courts will sustain the decision of the trial court if it is right for any reason, even one not presented by a party or considered or cited by the trial judge. . . ." (Emphasis added.) This holding in turn is cited in various cases as a basis for the affirm-on-any-valid-legal-ground rule. See, e.g., General Motors Corp., Liberty Nat'l Life Ins. Co., and Ex parte Ryals, 773 So.2d 1011 (Ala.2000).
The "right-for-any-reason" doctrine serves the dual ends of justice and judicial economy by preserving correct legal results, even when the specific grounds relied upon by trial courts are erroneous. Consistent with this objective of preserving correct results, the effect of our well-established principles of appellate review has been to allow affirmance of a trial court's judgment on a given ground if there has been a determination, either by the trial court or the appellate court, that that ground is, in fact, "valid" or "correct." Of course, when the ground is determined by the trial court to be valid, then, regardless of whether it is in truth meritorious, the fact that a court of competent jurisdiction said it is makes that determination binding upon the parties, unless and until an appellant meets its burden of demonstrating error in that determination. On the other hand, when a trial court has not determined the ground at issue to be valid, it is incumbent upon the appellate court to do so, else we cannot be said to be affirming the lower court's judgment on a "valid legal ground" or upholding a judgment that is "right for any reason." Again, to tie the hands of an appellate court so as to require it to affirm a judgment in certain circumstances without making such a determination will essentially change a rule that has allowed appellate courts to affirm judgments when those judgments are right for any reason into a rule that requires appellate courts, under certain circumstances, to affirm judgments even if they are wrong.[27]
*44 I also would interject a concern of a more practical nature: I believe the waiver rule at issue holds the potential for increasing the workload of attorneys and of trial and appellate judges alike. Some litigants may perceive it to be to their advantage to provide to the trial court a multitude of alternative grounds for their position, regardless of the merit of those grounds, in the hope that, if they are successful in the trial court, their opponent might fail to contest one or more of those grounds on appeal, thereby resulting in the affirmance of the judgment by "default." Undoubtedly, appellants will be forced to invest time and money studiously searching the trial court record to be sure they have not overlooked any argument that would, if not addressed on appeal, provide the basis for such a default.
Finally, I am not comforted by the notion that there would be an exception to the waiver rule announced in Fogarty for grounds deemed "frivolous" by a majority of the members of the appellate court reviewing the case. 979 So.2d at 47 (Lyons, J., dissenting). What is and is not "frivolous" will often be in the eye of the beholder; what is frivolous to one judge may be colorable to another. An unjust result for a litigant is no less so because the ground upon which that result is based is considered by a majority of an appellate court to be nonfrivolous, though incorrect, rather than frivolous and incorrect. In either case, the result is wrong.
In some states, the affirm-on-any-valid-legal-ground principle carries the colorful moniker of "the tipsy coachman rule." See Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638 (Fla.1999); Williams v. Freightliner, LLC, 196 Or. App. 83, 100 P.3d 1117 (2004). The use of that moniker stems from a 19th century Georgia case, Lee v. Porter, 63 Ga. 345, 346 (1879), in which the Georgia Supreme Court explained:
"It not infrequently happens that a judgment is affirmed upon a theory of the case which did not occur to the court that rendered it, or which did occur and was expressly repudiated. The human mind is so constituted that in many instances it finds the truth when wholly unable to find the way that leads to it."
*45 (Emphasis original.) The Georgia Supreme Court then invoked the following verse by Oliver Goldsmith:
"`[T]he pupil of impulse, it forc'd him along, His conduct still right, with his argument wrong; Still aiming at honor, yet fearing to roam, The coachman was tipsy, the chariot drove home.'" 63 Ga. at 346.
Although a coachman might not be competent to help a "chariot" reach its correct destination, the alternative of relying upon the horse alone to reach that destination may be available, but only if the horse has the wherewithal to do so. In a like manner, if a ground relied upon by a trial court in an effort to reach a given result is invalid and therefore not available for that purpose, an alternative ground may still be used by the appellate court to reach that result, but only if that alternative ground has the legal wherewithal to do so.
COBB, C.J., concurs.
LYONS, Justice (dissenting).
When JBJ filed its motion for a summary judgment seeking to block Pavilion's attempt to assert a statutory right of redemption with respect to certain realty purchased by Pavilion at a foreclosure sale, it relied on multiple grounds. These grounds fall into two categories: the lack of corporate authority to assert the right and the failure to comply with procedures for exercising the right of statutory redemption. The trial court ruled against JBJ on the alleged failure to comply with the appropriate statutory procedures. A successor trial judge ruled in favor of JBJ on the issue of lack of authority and dismissed the action, and Pavilion appealed. In both its opening brief and its reply brief, Pavilion ignored JBJ's defense dealing with the issue of failure to comply with the mechanics for the exercise of the right of statutory redemption.
This Court has frequently stated that it will affirm the judgment of the trial court for any reason supported by the record. This Court stated in Smith v. Equifax Services, Inc., 537 So.2d 463, 465 (Ala. 1988):
"An appellee can defend the trial court's ruling with an argument not raised below, for this Court `will affirm the judgment appealed from if supported on any valid legal ground.' Tucker v. Nichols, 431 So.2d 1263, 1265 (Ala. 1983). There is a rather obvious fundamental difference in upholding the trial court's judgment and reversing it; this Court will not reverse the trial court's judgment on a ground raised for the first time on appeal, Costarides v. Miller, 374 So.2d 1335 (Ala.1979), even though it affirms judgments on bases not asserted in the trial court, Bank of the Southeast v. Koslin, 380 So.2d 826 (Ala.1980). This difference is predicated on the `long-standing, well-established rule that [in order to secure a reversal] the appellant has an affirmative duty of showing error upon the record.' Tucker v. Nichols, supra, at 1264."
In Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000), this Court, citing Ex parte Wiginton, 743 So.2d 1071 (Ala.1999), and Smith v. Equifax Services, Inc., observed that "an appellate court can affirm a summary judgment on any valid argument, regardless of whether the argument was presented to, considered by, or even rejected by the trial court."
We recognized limitations on the applicability of this rule in Liberty National Life Insurance Co. v. University of Alabama Health Services Foundation, P.C., 881 So.2d 1013, 1020 (Ala.2003):
"This rule fails in application only where due-process constraints require some notice at the trial level, which was omitted, *46 of the basis that would otherwise support an affirmance, such as when a totally omitted affirmative defense might, if available for consideration, suffice to affirm a judgment, Ameriquest Mortgage Co. v. Bentley, 851 So.2d 458 (Ala.2002), or where a summary-judgment movant has not asserted before the trial court a failure of the nonmovant's evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element, Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala.2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Kennedy v. Western Sizzlin Corp., 857 So.2d 71 (Ala.2003))."
With respect to a ground asserted and rejected in the trial court, an appellee can obtain an affirmance based upon the merits of the rejected ground without having to file a cross-appeal. McMillan, Ltd. v. Warrior Drilling & Eng'g Co., 512 So.2d 14, 25 (Ala.1986).
In light of the "long-standing, well-established rule that [in order to secure a reversal] the appellant has an affirmative duty of showing error upon the record," recognized in Tucker v. Nichols, 431 So.2d 1263, 1265 (Ala.1983), we require the appellant, when the trial court does not specify a ground for its ruling, to address in its opening brief all grounds that were presented to the trial court in order to sustain its burden of showing error. See Fogarty v. Southworth, 953 So.2d 1225, 1232 (Ala. 2006):
"When an appellant confronts an issue below that the appellee contends warrants a judgment in its favor and the trial court's order does not specify a basis for its ruling, the omission of any argument on appeal as to that issue in the appellant's principal brief constitutes a waiver with respect to the issue. If the rule were otherwise, an appellant could `sandbag' an appellee by withholding an argument on an issue until the reply brief, thereby depriving the appellee of the opportunity to respond. See Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala.2005) (`It is a well-established principle of appellate review that we will not consider an issue not raised in an appellant's initial brief, but raised only in the reply brief.') (citing Birmingham Bd. of Educ. v. Boyd, 877 So.2d 592 (Ala.2003), and Sanders v. Smitherman, 776 So.2d 68, 73 (Ala. 2000)). We therefore affirm the summary judgment on the fraud count insofar as it is based on the alleged misrepresentations concerning the conveyance of the property as `free and clear,' because the Fogartys have waived the right to assert error with respect to that issue."
(Emphasis added; footnote omitted.)
In this proceeding, the trial court, albeit by a predecessor to the trial judge who had ruled on the motion giving rise to the order dismissing the action, rejected JBJ's defense based upon failure to satisfy the procedural requirements necessary for exercise of the right of statutory redemption. Pavilion, from the moment it filed its notice of appeal, was exposed to the prospect of JBJ's asserting its right to dismissal of the action based upon its defense of failure to satisfy procedural requirements without the necessity of JBJ's filing a cross-appeal. See McMillan, Ltd. v. Warrior Drilling & Eng'g Co., supra. By failing to assert the invalidity of this basis for affirmance in its opening brief, Pavilion failed to shoulder its affirmative duty of showing error upon the record.
Although Fogarty arose in a setting in which the trial court did not specify a ground for its judgment, the main opinion *47 limits its application to such a circumstance, thus departing from our well-settled principles applicable to the obligation of an appellant to demonstrate error in its principal brief and ignoring the equally well-established rule in McMillan, Ltd. v. Warrior Drilling & Engineering Co. allowing an appellee to urge affirmance on a ground rejected by the trial court in its brief without having to file a cross-appeal to bring the issue before the Court. The main opinion further draws conclusions as to the intent of the successor trial judge that are equally indifferent to the effect of the rule in McMillan, Ltd. v. Warrior Drilling & Engineering Co., which renders such conclusions irrelevant, even if accurate.
JBJ addressed in its brief the merits of its previously rejected defense based upon the failure to satisfy procedural requirements. To the extent JBJ's treatment of the merits of this issue in its brief might permit this Court to disregard Pavilion's waiver by failure to argue the issue in the opening brief, Pavilion ignored the issue once again in its reply brief. Even if the potential for confusion arising from multiple judges would justify relaxing the duties incumbent upon Pavilion in its opening brief, its failure to recognize its plight and to respond to JBJ's alternative argument for affirmance in the reply brief does not justify such lenity. Because a defense on this ground is not frivolous on its face, I would affirm the judgment of the trial court solely on the procedural default of Pavilion without analysis of its merits. I therefore respectfully dissent.
So as to incorporate what I consider to be the law of this state at this time and not by way of announcement of a new rule, I would recommend that the Standing Committee on Rules of Appellate Procedure consider the following amendments to Rule 28, Ala. R.App. P.:
Add the following sentence to Rule 28(a)(10):
"Where multiple or alternative grounds are presented to the trial court and the trial court does not expressly limit its consideration of such grounds, the argument must address the merits of each ground before the trial court, including any ground expressly rejected by the trial court, in the opening brief. Issues not argued are waived."
Add the following sentence to Rule 28(b):
"A waiver by the appellant pursuant to Rule 28(a)(10) with respect to multiple or alternative grounds will be disregarded in the event the appellee argues the merits of such grounds."
Add the following sentence to Rule 28(c):
"Where a waiver pursuant to Rule 28(a)(10) with respect to multiple or alternative grounds is disregarded pursuant to Rule 28(b) by reason of the appellee's argument of the merits of such grounds, the failure of the appellant to reply to the merits of such grounds shall constitute a waiver of those issues."
WOODALL, J., concurs.
NOTES
[1] A portion of the original 22 acres was released from the mortgage; thus, the development tract consisted of approximately 19 acres of unimproved land.
[2] JBJ is an Alabama general partnership; its general partners are James E. Pace, James P. Pace, and William Byron Pace. Those persons were also general partners in Pace.
[3] The parcels conveyed to Atlantis were lots 12 and 18 of block 1 in Pavilion Phase II, and lot 2 of block 2 in Pavilion Phase I.
[4] JBJ had granted the City of Huntsville a permanent drainage easement over a portion of the development tract on June 6, 1996. The City of Huntsville is not a party to this proceeding.
[5] John Lary, L.L.C., to whom Gallop subsequently transferred its statutory right of redemption, filed an affidavit in the trial court stating that Pourhassani received the March 9, 1997, notice and orally offered to sell his lot to Lary for $42,000.
[6] During the course of the litigation, John Lary, L.L.C., began operating as Pavilion Development, L.L.C.
[7] On March 21, 1997 at 12:38 p.m.eight minutes after Pace allegedly purchased the Gallop stockTracey filed a petition for personal bankruptcy. Tracey listed the Gallop stock as one of his assets in that petition. In March 2000, the bankruptcy court that adjudicated Tracey's personal bankruptcy case determined that the foreclosure sale on March 21, 1997, in which Pace purportedly purchased the Gallop stock was invalid; according to that court, Tracey, not Pace, owned the Gallop stock on March 21, 1997the date Tracey filed his petition in bankruptcy.
[8] Among other arguments, JBJ contended that Lary (1) did not comply with its obligation in § 6-5-252 to make a demand on the purchaser (or his or her transferees) for foreclosure-related debt and other lawful charges; (2) failed to comply with the provisions in § 6-5-254 relating to the appointment of a referee to resolve disputes over the value of permanent improvements; (3) failed to tender payment of charges to the purchaser (or his or her transferees) before filing suit as required in § 6-5-252; and (4) upon filing suit, failed to deposit adequate amounts into court as contemplated in § 6-5-256. JBJ also argued in its motion that summary judgment was proper because, it argued, Lary was judicially estopped from denying Gallop's waiver of its right of redemption and Lary had illegally attempted to effect a piecemeal redemption of the entire tract.
[9] In January 1999 Judge Aderholt stated that the following issues existed with respect to Lary's redemption claim: (1) the revival of the foreclosed Pace mortgage; (2) the times, payment frequency and amounts, and principal amount of any revival of that mortgage; (3) the legal effect of any responses to the demand for lawful charges; and (4) the lawful charges (if any) to be paid, any setoffs to those lawful charges, and Lary's obligations to complete the redemption of the real property.
[10] The trial court's October 22, 1997, order denying JBJ's initial summary-judgment motion was interlocutory. Only the November 4, 2004, order in which the trial court granted JBJ's second summary-judgment motion was made final.
[11] In Estes this Court considered § 5746, Ala. Code of 1907, and § 10140, Ala.Code of 1923; those and other related sections were precursor provisions to those now codified at §§ 6-5-247 through -257, Ala.Code 1975.
[12] When the restructure occurred, Gallop and Tracey stipulated in section 8.01(b) of the settlement agreement that they would waive their rights of redemption under Alabama law in the event of a subsequent foreclosure on the development tract. JBJ does not rely on that waiver provision here, however, because that provision was without legal effect. See § 6-5-250, Ala.Code 1975 (providing, in pertinent part, that the right of redemption "may not be waived in a deed of trust, judgment, or mortgage, or in any agreement before foreclosure or execution sale").
[13] This December 18, 1995, notice from counsel for Pace to Gallop stated that "[u]nder the terms of your agreement with [Pace] dated April 26, 1995, please be advised that Pace has elected to declare you in default and proceed to foreclosure." This notice did not specify the nature of the default, state which provision in the agreement had been breached, or specify a period within which to cure.
[14] Among other topics, the McKee letter advised Tracey: "[Y]ou are in default of your agreement with Pace Properties. You have [a maximum of] fourteen (14) days from the date of this letter . . . to redeem the stock of Gallop Enterprises, Inc., by payment in full of the debt . . . for which the stock was pledged as security. After this time, Pace Properties shall dispose of the stock."
[15] Pace foreclosed and sold the Gallop stock to itself on March 21, 1997eight days after Gallop assigned the stock to Lary. As discussed in note 7, the bankruptcy court that adjudicated Tracey's personal bankruptcy held that that sale was invalid.
[16] The customary procedures to remove a corporate officer and director include the election of a new board of directors, action by that board to terminate the employment of former officers, and the appointment of new officers.
[17] The Court in Selma Bridge Co. found that the interest of the holder of a stock certificate that had been pledged to secure a debt was superior to the interest of a judgment creditor who, with actual knowledge of the secured interest, attempted to levy on the pledged stock. 132 Ala. at 184, 31 So. at 509.
[18] This evidence was stated in Richard Tracey's affidavit that Pavilion submitted and relied upon in opposition to JBJ's summary-judgment motions.
[19] See Premiere Chevrolet, Inc. v. Headrick, 748 So.2d 891, 893 (Ala. 1999).
[20] The October 22, 1997, order also rejected the authority-to-assign argument later accepted by the trial court in 2004. That initial order was, however, interlocutory and subject to modification at any time before the entry of a final judgment.
[21] We are mindful that Pavilion did not address the failure-to-comply-with-statutory-requirements argument in its principal brief, and did not respond to those arguments in its reply brief after JBJ raised them in its appellee's brief. This Court recently found in Fogarty v. Southworth, 953 So.2d 1225 (Ala. 2006), that, when an appellant failed in its principal appellate brief to address an issue that had been before the trial court and that could have warranted a judgment below, the appellant's failure to argue that issue in its principal brief constituted a waiver as to that issue. 953 So.2d at 1232. However, the rule in Fogarty applies only where the trial court does not specify a basis for its ruling. As discussed in main text, the trial court here did specify a reason for its judgment, and the record indicates that it limited its November 4, 2004, order to the authority-to-assign issue Pavilion did contest on appeal.
[22] Matters to be considered by the trial court include the final adjudication of the failure-to-comply-with-statutory-requirements issue, the potential revival of the Pace mortgage, the amounts of lawful charges owed by Pavilion to the defendants, and the establishment of conditions for Pavilion to perfect its statutory right.
[23] The trial court in Fogarty did not specify the reasons supporting its judgment. Thus, it is not clear whether the trial court relied in that case on the appellee's arguments. In the case before us, however, the trial court did not rely on the argument that JBJ was entitled to a summary judgment in its favor because Pavilion had failed to comply with the procedures set forth in the redemption statute. Instead, the trial court entered a summary judgment in favor of JBJ on the authority-to-assign issue.
[24] This rule is limited by due-process constraints. See Liberty Nat'l Life Ins. Co., 881 So.2d at 1020.

As Justice See notes in his special writing in this case, the rule has been phrased in different ways in different cases. 979 So.2d at 38, 39 (See, J., concurring specially). Often, the word "will" has been used rather than "may." See, e.g., Smith v. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala.1988) (holding that "[a]n appellee can defend the trial court's ruling with an argument not raised below" because "this Court `will affirm the judgment appealed from if supported on any valid legal ground.' Tucker v. Nichols, 431 So.2d 1263, 1265 (Ala. 1983)"). At least in some of the cases, the statement that this Court "will" affirm on any valid legal ground appears to be an imprecise way of simply explaining that the Court maintains a demonstrated willingness to do so. In Liberty National Life Insurance Co., 881 So.2d at 1020, for example, this Court supported its statement that the Court "will affirm the trial court on any valid legal ground" with a citation to Ex parte Ryals, 773 So.2d 1011 (Ala.2000), which states merely that this Court "can" affirm a trial court's judgment on any valid legal ground. In turn, the Court in General Motors Corp. cited Liberty National Life Insurance Co. in support of its statement in that case that "[t]his Court may affirm" a trial court's judgment on any valid legal ground, 885 So.2d at 124 (emphasis added).
[25] The rule that an appellate court will not reverse a judgment on a ground not argued on appeal is synonymous with the "long-standing, well-established rule that [in order to secure a reversal] the appellant has an affirmative duty of showing error upon the record." Tucker v. Nichols, 431 So.2d 1263, 1264 (Ala.1983) (regarding the appellant's burden in a case in which the appellee urged certain grounds to this Court in support of the trial court's ruling). This Court noted in Tucker that the rule that the appellant has an affirmative duty of showing error upon the record is interrelated with the affirm-on-any-valid-legal-ground principle: "Th[e] rule [regarding the appellant's burden] is premised upon the fundamental proposition that an appellate court will not presume error and will affirm the judgment appealed from if supported on any valid legal ground." 431 So.2d at 1265.
[26] The Fogarty opinion also includes a citation to Rule 28(a)(10), Ala. R.App. P., and the requirement stated therein that an appellant's brief "shall contain `[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented." 953 So.2d at 1231-32 (emphasis added in Fogarty). In so doing, Fogarty appears to suggest that the emphasized passage means that an appellant's brief must address every issue presented in the trial court. The purpose of Rule 28(a)(10), however, is merely to describe the briefing requirements that must be met as to any issue that is to be presented on appeal. The consequences of a party's failing to present an issue on appeal is not the object of Rule 28(a)(10); such consequences are addressed in our caselaw through the rules of appellate review that are discussed in the text of this special writing.
[27] If, despite the absence of any express reference in the trial court's order to the basis for that order, the particular ground upon which the trial court relied is discernible from the record, an appellant, as a general rule, would indeed "waive" the right to argue that the trial court's reliance on that particular ground was error if the appellant did not make that argument in its initial appellate brief. I do not believe it to be appropriate, however, to apply such a "waiver" rule to an alternative ground, one it cannot be discerned was relied upon by a trial court and thus determined by that court to be valid. Of course, if the alternative ground is determined by the appellate court to be valid, then, under the affirm-on-any-valid-legal-ground rule, that alternative ground can serve as an appropriate basis on which to affirm the trial court's judgment. But this is entirely different from a waiver rule in that it depends not upon a party's omission or failure, but upon an affirmative determination by the appellate court that the alternative ground is in fact valid and therefore that the result reached is right.

I also note that limiting Fogarty to the particular circumstances presented in that case would bring the result reached in that case in line with the foregoing concept of waiver. Insofar as this Court's opinion in Fogarty reveals, the only discernible ground for the summary judgment against the Fogartys was that the Fogartys had constructive notice of the fraud more than two years before they filed suit. To that extent, it would not be the result reached in Fogarty with which I would disagree, but rather, the breadth of the Court's announcement that "[w]hen an appellant confronts an issue below that the appellee contends warrants a judgment in its favor and the trial court's order does not specify a basis for its ruling, the omission of any argument on appeal as to that issue in the appellant's principal brief constitutes a waiver with respect to the issue." 953 So.2d at 1232. In other words, in Fogarty, although the trial court's order "did not specify a basis for its ruling," it nonetheless appears that the trial court necessarily relied upon a particular theory in order to rule against the Fogartys. Thus, the Fogartys' failure to address that issue in their initial appellate brief normally would tend to be fatal to their ability to succeed on appeal. (Nonetheless, I still would question the result reached in Fogarty because of the fact that, despite the absence of any discussion of the constructive-notice issue in the appellant's initial brief, it appears that the appellees did in fact fully address the issue in their brief, and that the appellants thereafter briefed the issue in their reply brief. See Thoman Eng'rs, Inc. v. McDonald, 57 Ala. App. 287, 290, 328 So.2d 293, 295 (1976) ("We do not think that [the appellant's] brief fairly presents the issue of whether the decree below, independent of the ruling on the motion for new trial, granted damages inadequate on the weight of the evidence. We are thus not required to review this point. However, despite the apparent handicap, defendant did respond to this issue in his brief, and, in these circumstances, defendant suffering no actual hardship due to plaintiff's omissions, we determine that it is in keeping with the spirit of the [Ala. R. App. P.], to decide this question on its merits."). See also Kirksey v. Roberts, 613 So.2d 352, 353 (Ala.1993) ("[B]ecause we are able to adequately discern the issue [the appellant] presents, in spite of his failure to present authorities in support of his claim, we will not affirm merely because of a technicality."); Bishop v. Robinson, 516 So.2d 723, 724 (Ala.Civ.App.1987) ("As the husband adequately responded to the sole issue raised by the wife and did not suffer as a result of the wife's [failure to comply with Rule 28], we choose to decide the case on its merits.").)